UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

MOON CAPITAL MANAGEMENT LP,

                      Petitioner,

    – against –

GEK LANG LEE,

                      Respondent.

----------------------------------------------------------X

**07 CV 6002**

**JUDGE KOELTL**

No. 07 Civ. _____ (     )

**PETITION FOR INJUNCTIVE
RELIEF IN AID OF ARBITRATION**

JUN 2 5 2007

D N.Y.
CASHIERS

Petitioner Moon Capital Management LP ("Moon Capital"), by its attorneys

Friedman Kaplan Seiler & Adelman LLP, petitions this Court for a temporary restraining order

and a preliminary injunction in aid of arbitration compelling Respondent Gek Lang Lee

("Respondent") to honor a contractual commitment obligating her, through September 6, 2007,

not to affiliate herself with any asset management business that follows an investment program

similar to any used by Moon Capital. In support of its petition, Moon Capital alleges, upon

personal knowledge as to itself and its own actions, and upon information and belief as to all

other matters, as follows:

**FACTUAL ALLEGATIONS**

**The Parties**

       1.      Petitioner Moon Capital is a limited partnership organized and existing

under the laws of the State of Delaware, with its principal place of business at 499 Park Avenue,

New York, New York 10022. Moon Capital's general partner is JWM Capital LLC ("JWM"), a

limited liability company organized and existing under the laws of the State of Delaware, with its

principal place of business at 499 Park Avenue, New York, New York 10022. Moon Capital's

limited partners are all citizens of the United States, and are domiciled in this District.

475500.3

2.      Respondent Gek Lang Lee is a citizen of The Republic of Singapore, and resides at 7A Kings Road, Singapore 268173.

## Jurisdiction and Venue

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the matter in controversy is between a citizen of a State and a citizen of a foreign state and exceeds the sum or value of $75,000.

4.      This Court has personal jurisdiction over Respondent because, as discussed more fully below, Respondent agreed in writing to arbitrate in New York County any controversy or claim arising out of her employment agreement or otherwise relating to her employment. Petitioner has commenced an arbitration against Respondent based on that arbitration agreement, and this Court's intervention is necessary to preserve efficacy of the relief which could be awarded to Petitioner in that arbitration.

5.      Independently, this Court has personal jurisdiction over Respondent based on her transaction of business in New York. Respondent entered into an ongoing contractual relationship with Moon Capital, which is based in New York; the employment agreement that Respondent signed is governed by New York law; and in connection with her employment with Moon Capital, Respondent communicated daily with co-workers and others in New York, and traveled to New York on multiple occasions.

6.      Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the property that is the subject of the action is situated in this District, and because Respondent is subject to personal jurisdiction in this District. In addition, as set forth more fully below, the parties' arbitration agreement calls for arbitration to be held in New York County.

2

475500.3

## Moon Capital's Business

7.    Moon Capital is a hedge fund management company established in 1997, and then re-launched in 2005, which is the manager of certain private alternative investment vehicles (collectively, the "Funds") (Moon Capital and the Funds, collectively, the "Moon Entities").

8.    As part of Moon Capital's proprietary investment process, Moon Capital performs in-depth market and company-specific research in order to identify investment opportunities for the Funds. The Funds specialize in investments related to companies in emerging markets, with a particular focus on investment opportunities in Asia. The Moon Entities currently have approximately 50 employees worldwide.

9.    Moon Capital distinguishes itself from other asset managers through the depth and sophistication of its research efforts. Rather than sole reliance on publicly available information, Moon Capital routinely contacts, interviews, and forms relationships with executives and other representatives of companies in the Funds' investment portfolio, companies that the Funds are evaluating for investment opportunities, and competitor companies (collectively, "portfolio companies").

10.    In order to help focus its research, Moon Capital divides emerging markets into twelve industry-based "sectors." Research on each sector is managed by a "Research Sector Head." The investment decisions of Moon Capital are made by the Research Sector Heads with the oversight and input of Moon Capital's founder, John Moon, and they report directly to him. These Research Sector Heads become the outward face of Moon Capital in its efforts to contact, interview, gain an in-depth understanding of, and form a relationship with, portfolio companies. Portfolio company executives come to trust and respect Moon Capital Research Sector Heads

3

475500.3

because of this personal outreach, and because the Research Sector Heads demonstrate that they know the issues facing that company and its sector. Before her resignation, Respondent was one of Moon Capital's Research Sector Heads, and was responsible for researching real estate companies, primarily those with holdings in Asia and other emerging markets.

11.    Some of Moon Capital's most important assets are the relationships that it develops with portfolio companies and individuals and entities within the investment community that have information about such companies (collectively, "Moon Capital's Business Relationships"). Emerging market investors compete for investment opportunities among a limited number of sector companies. In contrast to investments made in capital markets outside the emerging markets sector, where there is significant publicly available information about potential investment opportunities, it is a time-consuming process to identify emerging market investment opportunities, perform the necessary research and establish appropriate business contacts with portfolio companies. Moon Capital has expended tremendous effort and many millions of dollars in cultivating relationships with these various contacts. Moon Capital's Business Relationships are just as – or perhaps more – important as Moon Capital's client relationships because without them Moon Capital would be unable to deliver the investment opportunities that Moon Capital's clients expect.

12.    In order to cultivate these relationships, Moon Capital invests heavily in its Research Sector Heads, such as Respondent, and in Moon Capital's Business Relationships. Moon Capital spends substantial sums to recruit Research Sector Heads, to train them, and to help them secure and build the Business Relationships. Moon Capital also provides support, including spending on extensive travel, so that its Research Sector Heads can develop and maintain the Business Relationships that are a critical part of Moon Capital's success.

4

13.    In addition, Research Sector Heads are exposed to Moon Capital's research and decision-making processes. The Research Sector Heads' knowledge of the companies considered and approved for investment by Moon Capital (or those rejected by Moon Capital), and the reasons behind such decisions, would be invaluable to other funds investing in the same sectors.

**Respondent Gains Access to Moon Capital's**
**Business Relationships and Confidential Information**

14.    Respondent joined the Singapore office of Moon Capital in June of 2005, with limited prior experience in buy-side investment in equities of real estate companies. Respondent was hired as the Research Sector Head (Property) with a focus on researching publicly-traded, but also private, companies with real estate holdings in Asia and other emerging markets. No other Moon Capital employee was permanently assigned to the Property sector after her hiring. Before Respondent was hired, Moon Capital made investments in the Property sector relying in large part on the Business Relationships that Moon Capital had developed in that sector over the years. Prior to her employment at Moon Capital, Respondent had no significant contacts at the portfolio companies. Since Respondent's employment with Moon Capital began, John Moon has spent significant time with her imparting his investment skills and otherwise training her to make investment decisions with respect to real estate companies, to evaluate and value such companies, and to utilize Moon Capital's Business Relationships to aid in the research process. In addition, at the daily research meetings (conducted between the New York and Singapore office via conference call), John Moon discusses investment decisions with each individual Research Sector Head and offers further training regarding the investment process.

475500.3

15.    Respondent's exposure to critical Moon Capital's Business Relationships in the property sector is amplified by the relatively limited number of companies with purchasable securities that actively participate in the Asian real estate market. Respondent's access to these contacts also was virtually exclusive because she was the sole Moon Capital employee permanently assigned to the property sector, and thus Moon Capital's primary point of contact with portfolio company contacts in that sector. Moon Capital cultivated these relationships, at significant cost and through the expenditure of a great deal of time and effort. Respondent's time at Moon Capital put her in a position to compete directly with Moon Capital using the Business Relationships she enjoyed while working for Moon Capital, and the information to which she was privy at Moon Capital.

16.    In addition, Research Sector Heads like the Respondent are exposed to Moon Capital's research and decision-making processes across all of its investment sectors. The Research Sector Heads' knowledge of the companies considered and approved for investment by Moon Capital (or those rejected by Moon Capital), and the reasons behind such decisions, would be invaluable to other funds investing in the same sectors.

**Respondent Agrees to Covenants Designed to**
**Protect Moon Capital's Legitimate Business Interests**

17.    In order to protect its Business Interests and its Confidential Information, on February 17, 2006, Moon Capital entered into an employment agreement with Respondent (the "Letter Agreement," attached as Exhibit 1); at about the same time, other Moon Capital employees also entered into similar employment agreements.

18.    In the Letter Agreement – which provides that it is to be governed by New York law (Moon Decl. Ex. 1 at ¶ 12(f)) – Respondent promised that in consideration for her employment at Moon Capital she would abide by a series of provisions designed to protect Moon

6

475500.3

Capital's legitimate business interests. (Significantly, as discussed more fully below, after Respondent's resignation, Moon Capital asked Respondent to reaffirm these promises, but she refused to do so.)

19.     In the Letter Agreement, Respondent acknowledged that she would become privy to the confidential information and trade secrets of Moon Capital and its affiliates, and agreed to keep such information and secrets strictly confidential. The Letter Agreement provides in pertinent part:

> 2.    Confidential Information. You acknowledge that you shall acquire during your employment with the Management Company and its affiliates Confidential Information (as defined below) regarding the business of the Management Company and any of its affiliates (including its affiliated funds or accounts) (collectively, the "Moon Entities"). Accordingly, you agree that, without the prior written consent of the Management Company, you shall not, at any time, except as may be required by law or legal process, disclose to any unauthorized person, otherwise use or remove from the Management Company premises, any such Confidential Information for any reason other than the business of the Moon Entities. You agree to safeguard Confidential Information and exercise caution when using Confidential Information. "Confidential Information" means non-public information concerning the Moon Entities, including without limitation the Moon Entities' operations, systems, services, personnel, marketing, financial and legal affairs, investment and trading performance, positions, philosophies, strategies and techniques, structure, products, product development, research analyses, technology, computer access codes, valuation models and analysis, credit files, risk management tools, portfolio composition, trading parameters and risk limits, and clients and investors and client and investor lists (including, without limitation, the identity of clients or investors, names, addresses, contact persons and the client or investors' business or investment status, strategies or needs).

20.     In the Letter Agreement, Respondent also acknowledged that the work she performed for Moon Capital would belong solely to Moon Capital:

> 6.    Work Product. You agree that all ideas, inventions, discoveries, systems, interfaces, protocols, concepts, formats, suggestions, creations, developments, arrangements, designs, programs, products, processes, investment strategies, materials, computer programs

7

475500.3

or software, data bases, improvements, valuation models, risk management tools, portfolio optimization models, or other properties related to the business of the Moon Entities conceived, made or developed during your employment with the Management Company and its affiliates, whether conceived by you alone or working with others, and whether patentable or not (the "Work Product"), shall be owned by, and belong exclusively to, the Management Company. You hereby assign to the Management Company your entire rights to the Work Product and agree to execute any documents and take any action reasonably requested by the Management Company to protect the rights of the Moon Entities, in any Work Product.

21.    Respondent also acknowledged that all electronic or papers documents concerning Moon Capital's business belonged to Moon Capital, and agreed to return them to Moon Capital upon termination of her employment. The Letter Agreement provides:

> 5. <u>Management Company Property</u>. You acknowledge that all property, originals and copies of materials, records and documents (including materials maintained electronically) generated by you or coming into your possession or under your control during your employment with the Management Company and its affiliates, including but not limited to information relating to the Confidential Information of the Moon Entities, are the sole property of the Management Company. Upon the termination of your employment with the Management Company and its affiliates for any reason, or upon the request of the Management Company at any time, you will promptly deliver all copies of such materials to the Management Company. At no time will you remove or cause to be removed from the premises of Management Company any record, file, memorandum, document, equipment or other item relating to the business of the Moon Entities, including but not limited to any computer data related to the foregoing, except in furtherance of your duties to the Management Company.

22.    In consideration for her employment at Moon Capital, and in light of her position there and the Confidential Information to which she would be privy, Respondent also agreed that, so long as her employment was not terminated by Moon Capital without cause, for 90 days after termination of her employment she would not become affiliated in any way any asset management business that follows an investment program similar to Moon Capital or any of its affiliates. The Agreement provides in pertinent part:

8

475500.3

7. <u>Non-Competition</u>. During your employment and for a 90 day period following the termination of your employment for any reason other than a termination by the Management Company without Cause (as defined below), you shall not whether individually, as a director, manager, member, stockholder, partner, owner, employee, consultant or agent of any business, or in any other capacity, other than on behalf of the Management Company, organize, establish, own, operate, manage, control, engage in, participate in, invest in, permit your name to be used by, act as a consultant or advisor to, render services for (alone or in association with any person, firm, corporation or business organization), or otherwise assist any person or entity that engages in or owns, invests in, operates, manages or controls any venture or enterprise which engages or proposes to engage in any hedge fund business or asset management business that follows an investment program similar to any of the Moon Entities.

23.    Respondent also acknowledged that the above promises are reasonable and that Moon Capital would suffer irreparable harm if she breached them; she also agreed that Moon Capital, in the event of such breach, would be entitled to injunctive relief without bond. The Letter Agreement provides in pertinent part:

11. <u>Remedy for Breach</u>. You hereby acknowledge that the provisions of this Letter Agreement are reasonable and necessary for the protection of Moon Entities. You further acknowledge that the Moon Entities will be irreparably harmed if such covenants are not specifically enforced. Accordingly, you agree that, in addition to any other relief to which the Management Company may be entitled, including claims for damages, the Management Company shall be entitled to seek and obtain injunctive relief (without the requirement of any bond) from a court of competent jurisdiction for the purpose of restraining you from an actual or threatened breach of such covenants.

24.    The Letter Agreement also expressly provides for judicial reformation of the restrictive covenants should they be found to be overbroad:

[12](h)    <u>Judicial Modification</u>. If any court or arbitrator determines that any of the covenants herein or any part of any of them, is invalid or unenforceable, the remainder of such covenants and parts thereof shall not thereby be affected and shall be given full effect, without regard to the invalid portion. If any court or arbitrator determines that any of such covenants, or any part thereof, is invalid or unenforceable because of the geographic or temporal scope of such

9

provision, such court or arbitrator shall reduce such scope to the extent necessary to make such covenants valid and enforceable.

## Respondent's Arbitration Agreement

25.    In the Letter Agreement, Respondent expressly agreed to arbitrate in New York County any controversy or claim arising out of the Letter Agreement or otherwise relating to your employment with Moon Capital (reserving for Moon Capital, however, the right to seek injunctive relief from a court).  The Letter Agreement provides:

> [12](i)    Arbitration.  You and the Management Company agree to arbitrate any controversy or claim arising out of this Letter Agreement or otherwise relating to your employment with the Management Company and its affiliates or the termination of such employment (including, but not limited to, any claims of breach of contract, wrongful termination or age, sex, race or other discrimination); provided that the Management Company shall have the right to, and be permitted to, seek and obtain injunctive relief from a court of competent jurisdiction.  Any such arbitration shall be fully and finally resolved in binding arbitration in a proceeding in the State of New York, County of New York in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association before a single arbitrator.  The arbitration proceedings shall be confidential.  The arbitrator shall not have the authority to modify or change any of the terms of this Agreement, except as provided in paragraph 12(h) hereof. The arbitrator's award shall be final and binding upon you and the Management Company, and judgment upon the award may be entered in any court of competent jurisdiction in any state of the United States or country or application may be made to such court for a judicial acceptance of the award and an enforcement as the law of such jurisdiction may require or allow.  The arbitrator may require the losing party thereto, as determined by the arbitrator, to bear the costs and fees incurred in any such arbitration, including legal fees and expenses.

## Respondent Resigns, Accepts Employment with Pramerica Asia, And Signals Her Intention to Breach Her Promises to Moon Capital

26.    Respondent's Letter Agreement requires her to give one month's advance written notice prior to her resignation (Exhibit 1 at ¶ 1), and she gave such notice on May 16, 2007.  Shortly thereafter, Respondent informed Moon Capital that she was going to work at Pramerica Real Estate Investors (Asia) Pte Ltd. ("Pramerica Asia").

475500.3

27.    Pramerica Asia's website proclaims itself "one of the largest real estate investment managers." (Moon Decl. Ex. 2.) Additionally, Pramerica Asia touts its "global research team, which includes dedicated research staff located in Asia, as well as local resources to source relevant research information," and states that its investment strategy includes a "[r]eview [of] market intelligence utilizing numerous sources of relevant information for both off-market and open transactions." (Moon Decl. Ex. 3.) Based on Pramerica Asia's own statements, there can be no doubt that it is an "asset management business" that "follows an investment program similar to that of the Moon Entities," thus bringing the non-competition provision of the Letter Agreement fully to bear.

28.    After Respondent's resignation, Moon Capital asked her to affirm in writing her obligations under the Letter Agreement. Respondent refused to do so, stating that Moon Capital should first contact Pramerica Asia to discuss any issues.

29.    Thereafter, counsel for Moon Capital and Pramerica Asia exchanged multiple communications concerning Respondent's obligations under the Letter Agreement. However, on Thursday, June 21, 2007, counsel for Pramerica Asia sent Moon Capital a letter indicating that Respondent (and Pramerica Asia) would not be honoring her 90-day non-competition obligation. Accordingly, Moon Capital moved to commence proceedings against Respondent.

30.    Upon information and belief, Respondent is planning on beginning work for Pramerica Asia some time the week of June 25, 2007.

**Moon Capital is Threatened**
**With Immediate and Irreparable Harm**

31.    With Respondent poised to begin her new employment at Pramerica Asia, Moon Capital is threatened with immediate and irreparable harm.

475500.3

32.    First, Moon Capital will be greatly harmed if Respondent is permitted to immediately and unfairly exploit the Business Relationships that Moon Capital has cultivated. One of the purposes of the 90-day non-competition period in the Letter Agreement is to give Moon Capital the time it needs to stabilize its Business Relationships when a Research Sector Head leaves its employ.   Moon Capital cannot, without a period of at least 90 days, train another Research Sector Head to evaluate and monitor the Fund's existing investments, to maintain Moon Capital's existing Business Relationships, and to seek out, evaluate, and potentially participate in new investment opportunities involving portfolio companies.

33.    Furthermore, during this period when Moon Capital's abilities are impaired by Respondent's departure, Respondent will be in a position to divert to her new employer private offerings or other investment opportunities of which she became aware during her employment at Moon Capital.  This would undermine the investment opportunities that Moon Capital has put significant time and money into developing.

34.    In addition, Respondent was privy to the Funds' investment strategy and process, not just in the real estate sector, but across all sectors.  The Funds' strategy includes taking short positions on certain companies.  Respondent's knowledge of the size and price point of these short positions put her in a position to greatly injure the Funds by inappropriately using such information at Pramerica Asia.  In addition, Respondent is familiar with the research process used by Moon Capital to identify potential Fund investment opportunities.  This research process is a major point of differentiation between Moon Capital and other investment managers. Respondent should not be allowed to immediately take what she has learned at Moon Capital and use it for the benefit of Pramerica Asia, an entity with which Moon Capital competes for investment opportunities.

475500.3

35.    Finally, Respondent's departure makes it significantly more difficult for Moon Capital to exploit investment opportunities in the Property sector. For a period of nearly two years, Respondent was the only Moon Capital employee permanently assigned to conduct in-depth research on companies in the Property sector. It will take time for Moon Capital to find and adequately train Respondent's replacement and to rebuild the Business Relationships that it cultivated through the work for which Respondent was compensated. Moon Capital relied on the promises made by Respondent in her employment agreement that ensured Moon Capital would have 90 days in which to find and train a replacement without fear that Respondent would be using her Moon Capital-developed Business Relationships to immediately compete with the Funds.

36.    While money damages certainly will be sought by Moon Capital, they are inadequate to compensate it for these harms which are inherently difficult to quantify. It is impossible to gauge how many investment opportunities would be lost, and the harm that would be visited upon Moon Capital's business relationships, if Respondent is allowed to violate her agreement not to compete. It is also impossible to predict how losses of investment opportunities in the short term may affect Moon Capital in the long term. And it is impossible to know how Respondent's use of Moon Capital's confidential investment process and research contacts will cause an erosion in Moon Capital's competitive advantage over other investment managers.

37.    Accordingly, there is no adequate monetary remedy for Moon Capital's harm.

## PRAYER FOR RELIEF

38.    The parties' agreement to arbitrate any controversy or claim arising out of the Letter Agreement or otherwise relating to Respondent's employment with Moon Capital is

13

475500.3

enforceable by this Court pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, et seq., which authorizes this Court to enter an order directing that arbitration provided for in the arbitration agreement. *See* 9 U.S.C. § 4.

39.    Ancillary to its power under the Federal Arbitration Act to compel arbitration, this Court is empowered to issue temporary and preliminary injunctive relief to preserve the meaningfulness of arbitration by preventing a party from irreversibly altering the status quo.

40.    This Court is further authorized to grant such injunctive relief pending arbitration pursuant to 28 U.S.C. § 1651, in aid of its jurisdiction.

WHEREFORE, Moon Capital prays that a temporary and preliminary injunction be entered:

A.    Through September 6, 2007, restraining and enjoining Respondent from performing any services for Pramerica Real Estate Investors (Asia) Pte Ltd. or any other entity that (pursuant the Letter Agreement) "engage[s] in any hedge fund business or asset management business that follows an investment program similar to any of" the Moon Entities;

B.    Restraining and enjoining Respondent from disclosing or using at any time any of the Moon Entities' "Confidential Information" (as that term is defined in the Letter Agreement), and compelling Respondent and all those acting in concert with her to return immediately to Moon Capital all such Confidential Information in their possession, custody, or control; and

C.    Granting Moon Capital such other and further relief that is just and proper.

475500.3

Dated: New York, New York
   June 25, 2007

          FRIEDMAN KAPLAN
          SEILER & ADELMAN LLP

          Lance J. Gotko (LG-5443)
          1633 Broadway
          New York, New York 10017
          (212) 833-1100

          *Attorneys for Petitioner*
          *Moon Capital Management LP*

15

475500.3