# Exhibit 3

2001 WL 761067  
144 Lab.Cas. P 59,393  
(Cite as: 2001 WL 761067 (S.D.N.Y.))

Page 1

C  United States District Court, S.D. New York.

JAY'S CUSTOM STRINGING, INC., Plaintiff,  
v.  
Ron Jonghwan YU, Defendant.

No. 01CIV.1690 (WHP).

July 6, 2001.

Anthony J. Ferrara, Esq., Polstein, Ferrara, Dwyer & Speed, P.C., New York, for Plaintiff.

Deborah DeHart Cannavino, Esq., Tyler Cooper & Alcorn, LLP, Stamford, CT, for Defendant.

MEMORANDUM AND ORDER

PAULEY, District J.

*1 This diversity action involves claims of breach of contract, breach of fiduciary duty and misappropriation of trade secrets in the milieu of tennis racket customizing and stringing. Plaintiff Jay's Custom Stringing, Inc. ("JCS") moves for a preliminary injunction that prohibits its former employee, defendant Ron Jonghwan Yu ("Yu"), from violating the restrictive covenant in his employment agreement by working with his new employer, disclosing any trade secrets or proprietary information, and soliciting JCS's customers and employees.

JCS commenced this action on February 26, 2001. The next day, JCS filed an order to show cause and an application for a temporary restraining order and preliminary injunction prohibiting, *inter alia*, Yu from violating the terms of his employment agreement and an agreement concerning confidentiality. After hearing argument from both parties, this Court denied the application for a temporary restraining order; in light of the fact that Yu terminated his employment with JCS in September 2000, JCS's delay in seeking provisional relief showed a lack of exigent circumstances requiring extraordinary relief. *See* Fed.R.Civ.P. 65(b). Having denied the temporary restraining order, this Court granted expedited discovery and set an accelerated briefing schedule on JCS's motion for a preliminary injunction. Disputed factual issues raised in the parties' submissions prompted this Court to conduct an evidentiary hearing pursuant to Rule 43(e) of the Federal Rules of Civil Procedure. During this hearing, Jay Schweid, the founder and president of JCS, and defendant Yu testified and were subject to cross-examination. Following the hearing, the Court solicited supplemental letter briefs from the parties.

For the reasons discussed below, plaintiff's motion for preliminary injunction is denied.

Factual Background

Since 1980, JCS has been providing specialized tennis racket customizing and stringing services to tennis professionals, including many of the top-ranked players in the world. (Reply Affidavit of Jay Schweid ("Schweid Aff.") ¶ 3 & Ex. 16.) JCS offers its clients trained personnel who provide on-site racket services at major tennis tournaments in the United States, Europe and Australia as well as support before and after tournaments. (*See* Transcript of Hearing dated May 15, 2001 ("Tr.") at 17-20.)

JCS customizes tennis rackets through a number of proprietary techniques for molding, gripping, and weighting. (*See* Tr. at 8-11.) One of the unique features of JCS's business is the JART, a patented computerized device invented in part by Schweid. (*See* Schweid Aff. ¶ 13; Tr. at 51, 61.) The JART enables the weight, balance point, and swing weight of a tennis racket to be duplicated automatically through a computer program that uses data supplied by the device's measuring unit and a JCS database. (*See* Schweid Aff. Ex. 15; Tr. at 10-11.) Although it is common in the industry to customize a racket by adjusting its weight or balance point, the JART uses its own internal scale to produce a swing weight value. (Tr. at 11, 44, 59, 71-72.) Thus, because the swing weight value derived by JCS is not relevant to any other customized method that does not use the JART, rackets customized by JCS cannot be duplicated except with great difficulty through a time-consuming process of trial and error. (Schweid Aff. ¶¶ 13, 25; Tr. at 20-21, 44, 60-61, 71.) The racket specifications recorded by JCS generally are not known to the player. (*See* Tr. at 20-21.)

*2 In comparison to customizing, racket stringing is a relatively non-technical process. Players typically know their preferences in terms of string-type and tension and understand their other penchants such as when they like to have their racket strung (morning or evening) and whether they prefer pre-stretched string. (*See* Tr. at 69, 84-85, 88.) As Schweid testified: "An experienced stringer is going to be able to string a professional player's racket." (Tr. at 33.) Indeed, JCS clients participate in smaller tournaments

2001 WL 761067
144 Lab.Cas. P 59,393
(Cite as: 2001 WL 761067 (S.D.N.Y.))

Page 2

throughout the world not serviced by JCS, but nonetheless are able to have their rackets strung. (Tr. at 87-88.)

JCS records a player's customizing specifications and stringing preferences on a computer database in an individual profile. (Schweid Aff. ¶ 24.) JCS's player-by-player profiles also include historical information about various tournaments attended by a player such as surface condition, weather and ball-type. (Tr. at 15.) This information allows JCS to provide a player with performance-related information useful at future engagements at the same tournament and may offer guidance as to how a player's racket is to be customized for a particular event. (Tr. at 15.) Certain of the information stored on the JCS database is posted on the company's website. For example, the website lists most, if not all, of JCS's clients. (See Affidavit of Ron Yu ("Yu Aff.") Ex. D (showing the results of clicking the "Players" icon at www.jcsnyc.com).) In addition, the website publishes the stringing preferences of many of JCS's clients, reflecting the information recorded on the company's database. (See, e.g., Tr. at 37 (Karim Alami); Tr. at 38-39 (Jonas Bjorkman).)

Yu has been stringing rackets since 1987. (Tr. at 68.) Yu first worked for JCS as an on-site stringer at the Lipton Championship tennis tournament in 1995 and 1998. (Yu Aff. ¶¶ 8, 14.) As an on-site stringer, Yu was given access to, among other things, the names of JCS's clients, players' stringing preferences and pricing information without being required to sign any confidentiality agreement. (Yu Aff. ¶¶ 10-16.)

Following the 1998 Lipton Championship, JCS hired Yu as an independent contractor, and later as an employee, and trained him in the craft of customizing and stringing tennis rackets. (Yu Aff. ¶¶ 18-20.) As part of his employment, Yu was provided with a laptop computer that contained the JCS database with players' profiles, price lists and other business information of JCS. (Schweid Aff. ¶ 16; Yu Aff. ¶ 26.) In late 1999 or early 2000, Yu accidentally stepped on the laptop and broke the screen. (Yu Aff. ¶ 33.) After Yu paid JCS $400 to replace the computer, Schweid agreed to allow Yu to keep the damaged laptop. (Yu Aff. ¶ 33.)

At the time JCS engaged Yu as an independent contractor, the parties executed a Confidentiality Agreement dated April 22, 1998. (Yu Aff. Ex. B.) In substance, the Confidentiality Agreement obligated Yu to maintain as confidential "certain tennis racquet stringing and customizing skills, techniques, concepts, procedures and methods and information" relating to JCS's business. (See Yu Aff. Ex. B ¶ 1.)

*3 With the offer of full-time employment, JCS presented Yu with an Employment Agreement dated as of August 13, 1998, which the parties executed. (Yu Aff. Ex. C.) Upon the termination or expiration of the Employment Agreement, Yu was subject to a broad restrictive covenant that effectively barred him from working as a tennis racket technician anywhere in the world for a period of two years. Specifically, the Employment Agreement provided that:

(a) For a period of two (2) years following the termination or expiration hereof, [Yu] agrees and covenants as follows, all of which shall be applicable in the territory herein defined as being anywhere on earth ("the Territory"):

(b) [Yu] shall not directly or indirectly, as a proprietor, director, officer, shareholder, employee, partner, co-venturer, consultant or in any other capacity conduct or participate in a business which engages in tennis racquet stringing and/or customizing, and/or any other business in which JCS engages during the Term.

(c) [Yu] shall not solicit or accept any business from any competitor of JCS or from any individual or entity which is, during the Term, a client of JCS.

(d) [Yu] shall not at any time directly or indirectly request or advise any individual or entity which is, during the Term, a client or which may become a client of JCS to withdraw, curtail or cancel its business with JCS.

(e) [Yu] agrees not to directly or indirectly induce or attempt to influence any employee of JCS to curtail or terminate her or his employment with JCS.

(Yu Aff. Ex. C ¶ 2(a)-(e).)

As part of the restrictive covenant, JCS secured from Yu the representation that he previously had been "gainfully employed in several industries unrelated to the business conducted by JCS" and that he had "no training as, and had never before been employed as a tennis racquet technician, or customizer." (Yu Aff. Ex. C. ¶ 2(f).) This representation, evidently presented to Yu on a take it or leave it basis, proved to be false, as Yu previously had been employed as a tennis racket technician for a number of years. (Yu Aff. ¶¶ 21-22; Tr. at 85.) It is apparent that JCS extracted this representation so that, in the event Yu left on unfavorable terms, the company could argue, as it did in its moving papers, that Yu "admitted his past experience in industries unrelated to JCS's business" and, thus, "is capable of earning a living in other areas." (Pl.'s Mem. Of Law at 7.)

2001 WL 761067
144 Lab.Cas. P 59,393
(Cite as: 2001 WL 761067 (S.D.N.Y.))

Page 3

In January 2000, while working at the Australian Open, Yu discussed going into business with Nathan Ferguson of Priority One, a JCS competitor. (*See* Affidavit of Bianca Van Asselt ("Van Asselt Aff.") ¶ ¶ 7-8.) Ferguson is the exclusive tournament stringer for Pete Sampras, one of the top-ranked men's players in the world (Schweid Aff. ¶ ¶ 18-19), and hiring Yu would permit Priority One to service other players at major tournaments (*see* Van Asselt Aff. ¶ ¶ 7-8). In May 2000, Yu notified JCS of his intent to resign, but agreed to remain with the company through September 2000 in order to work the U.S. Open. (Yu Aff. ¶ 37.) In January 2001, Yu joined Priority One as a racket stringer. (Yu Aff. ¶ 38.) The instant litigation then ensued some two months later.

*4 In its verified complaint, JCS sets out four claims for relief: (i) an injunction based on the restrictive covenant in the Employment Agreement and the provisions of the Confidentiality Agreement; (ii) breach of contract; (iii) breach of fiduciary duty; and (iv) misappropriation of trade secrets. JCS argues that Yu is violating the reasonable terms of the Employment Agreement and Confidentiality Agreement by engaging in the business of racket customizing and stringing, disclosing JCS's business information claimed to be trade secrets, and soliciting JCS's clients and employees. Yu responds that the restrictive covenant is not directed to protect any legitimate interest, that the restrictive covenant in the Employment Agreement is unreasonable in scope and duration and therefore not enforceable, and that he has not misappropriated any trade secrets or sought to solicit any of JCS's clients or employees.

Discussion

Preliminary injunctive relief is "an extraordinary and drastic remedy which should not be routinely granted." *Medical Society of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977); *Earthweb, Inc. v. Schlack*, 71 F.Supp.2d 299, 308 (S.D.N.Y.1999), *remanded*, 208 F.3d 1322 (2d Cir.), *aff'd*, 2000 WL 1093320 (2d Cir. May 18, 2000). Accordingly, the plaintiff must demonstrate: "(1) either a likelihood that he will succeed on the merits of his claim, or that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, he will likely suffer irreparable harm before the court can rule upon his claim." *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir.1994); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

A. *Likelihood of success on the merits*

Pursuant to the agreements at issue, the law of the State of New York governs this action. (*See* Yu Aff. Ex. B ¶ 4 (Confidentiality Agreement); Yu Aff. Ex. C ¶ 7 (Employment Agreement).)

New York courts use a standard of reasonableness in judging the validity of restrictive covenants. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388, 690 N.Y.S.2d 854, 856 (1999). "[A] restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *BDO Seidman*, 93 N.Y.2d at 389, 690 N.Y.S.2d at 857. An employer may legitimately use a restrictive covenant (i) to prevent an employee's solicitation or disclosure of trade secrets, (ii) to prevent an employee's release of confidential information regarding the employer's customers, or (iii) in those cases where the employee's services to the employer are deemed special or unique. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir.1999); *BDO Seidman*, 93 N.Y.2d at 388-89, 690 N.Y.S.2d at 856-57; *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679 (1976).

*5 Restrictive covenants are generally disfavored by law and are only enforced under limited circumstances. *See Business Networks of New York, Inc. v. Complete Network Solutions, Inc.*, 265 A.D.2d 194, 195, 696 N.Y.S.2d 433, 435 (1st Dep't 1999). The policy underlying this strict approach rests on notions of employee mobility and free enterprise. "[O]nce the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." *American Broad. Cos., Inc. v. Wolf*, 52 N.Y.2d 394, 404, 438 N.Y.S.2d 482, 487 (1981). "Important, too, are the powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *American Broad.*, 52 N.Y.2d at 404, 438 N.Y.S.2d at 487 (quoting *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604 (1963)). On the other hand, "the employer is entitled to protection from unfair or illegal conduct that causes economic injury." *American Broad.*, 52 N.Y.2d at 404, 438 N.Y.S.2d at 487; *see also Reed, Roberts Assocs.*, 40 N.Y.2d at 308, 386 N.Y.S.2d at 680.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 761067                                                                                              Page 4
144 Lab.Cas. P 59,393
(Cite as: 2001 WL 761067 (S.D.N.Y.))

In this case, JCS contends that the restrictive covenant is necessary to protect its proprietary business information from disclosure to third parties and to maintain its customer relationships. [FN1]

> FN1. To a lesser degree, JCS seeks to justify the restrictive covenant based on the "unique" services offered by Yu. (*See* Pl.'s Reply Mem. at 14-15.) This argument lacks merit. "Unique services have been found in various categories of employment where the services are dependent on an employee's special talents; such categories include musicians, professional athletes, actors and the like." *Ticor,* 173 F.3d at 70. However, racket technicians such as Yu were routinely replaced at JCS (Yu Aff. ¶ 25) and there is no showing that the loss of his services caused JCS irreparable injury. *See Earthweb,* 71 F.Supp.2d at 313.

1. *Trade secrets*

Under New York law, a trade secret has been defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 917-18 (1993) (quoting *Restatement of Torts* § 757 cmt. b (1939)); *accord North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir.1999). In determining whether information constitutes a trade secret, New York courts have considered: (i) the extent to which the information is known outside of the business; (ii) the extent to which it is known by employees and others involved in the business; (iii) the extent of measures taken by the business to guard the secrecy of the information; (iv) the value of the information to the business and its competitors; (v) the amount of effort or money expended by the business in developing the information; and (vi) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Ashland Management,* 82 N.Y.2d at 407, 604 N.Y.S.2d at 918; *accord Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc.,* 01 Civ. 1234(SAS), 2001 WL 434496, at *15 (S.D.N.Y. Apr. 27, 2001); *Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 556 (E.D.N.Y.1995). JCS seeks trade secret protection for four categories of its business information: players' customizing specifications, players' stringing preferences, the identity of its customers, and pricing information. (*See* Compl. ¶¶ 15, 38.)

*6 Information detailing the characteristics and nature of customer specifications and preferences may be eligible for trade secret protection. *See Webcraft Techs., Inc. v. McCaw,* 674 F.Supp. 1039, 1046-47 (S.D.N.Y.1987); *Churchill Communications Corp. v. Demyanovich,* 668 F.Supp. 207, 212 (S.D.N.Y.1987); *Greenwich Mills Co. v. Barrie House Coffee Co.,* 91 A.D.2d 398, 405, 459 N.Y.S.2d 454, 459 (2d Dep't 1983); Roger M. Milgram, *Milgram on Trade Secrets* § 1.09[8][a], at 1-456 (2001). Nevertheless, trade secret protection will not attach to customer information that easily can be recalled or obtained from the customers themselves. *See Tactica Int'l,* 2001 WL 434496, at *16; *Earthweb,* 71 F.Supp.2d at 315; *Ivy Mar,* 907 F.Supp. at 558.

Applying those principles here, this Court finds that the players' customizing specifications recorded on JCS's computer database are entitled to trade secret protection. The values used to customize players' rackets are generated by the JART, a patented device unique in the industry, and reflect precise measurements that are unknown to the players themselves. One of the values, the swing weight, is calculated by the JART's internal scale and is not readily reproduced by any other customizing method. The database also contains the players' specifications for molding and gripping, two customizing techniques that involve chemical and mechanical processes proprietary to JCS. In short, the customizing specifications and the molding and gripping processes are trade secrets because they afford JCS a competitive advantage, are regarded and treated as proprietary by the company, and are not known to outsiders.

By contrast, the players' stringing preferences are not entitled to trade secret protection. The specific stringing needs and predilections of the players are readily ascertainable from the players themselves and, moreover, to large extent have been published by JCS on its website. Likewise, the identities of JCS's current or prospective customers are not confidential because they too are discoverable from JCS's website as well as from outside sources, namely any ranking of the world's top tennis professionals. *See American Inst. of Chemical Eng'rs v. Reber-Friel Co.,* 682 F.2d 382, 387 (2d Cir.1982); *Reed, Robert Assocs.,* 40 N.Y.2d at 308, 386 N.Y.S.2d at 680. Nor is JCS's pricing information to

2001 WL 761067
144 Lab.Cas. P 59,393
(Cite as: 2001 WL 761067 (S.D.N.Y.))

Page 5

be accorded trade secret status. Yu last worked for JCS over nine months ago and whatever he can now recall about his former employer's costs and pricing margins is likely to be outdated. *See Tactica Int'l, 2001 WL 434496, at \*16 n. 20; Ivy Mar, 907 F.Supp. at 558*. Significantly, Yu had access to the names of JCS's clients, players' stringing preferences and JCS's pricing information at the Lipton Championships in 1995 and 1998 without being required to sign any confidentiality agreement. This is inconsistent with JCS's present contention that those categories of information should enjoy trade secret status.

2. *Reasonableness of scope and duration*

\*7 Even assuming, however, that all of the information JCS seeks to protect could be considered a trade secret, the restrictive covenant cannot be enforced unless it is "reasonably limited temporally and geographically." *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006 (1977)*. As stated, JCS seeks to enforce a non-competition clause that precludes Yu from working "anywhere on earth" in his chosen profession for a period of two years. This Court previously refused to uphold a restrictive covenant containing similar terms. *See Heartland Sec. Corp. v. Gerstenblatt*, No. 99 Civ. 3694(WHP), *2000 WL 303274, at \*7 (S.D.N.Y. March 22, 2000)* (finding restrictive covenant with duration of two years and covering "the entire earth" to be unreasonable as a matter of law). JCS has failed to identify any New York case that supports enforcement of such a broad covenant. *Cf. Churchill Communications, 668 F.Supp. at 208, 215* (upholding restrictive covenant effective for two years, but limited to geographic areas in which employer conducted business); *Contempo Communications., Inc. v. MJM Creative Servs., Inc., 182 A.D.2d 351, 582 N.Y.S.2d 667 (1st Dep't 1992)* (upholding non-compete agreement effective for two years that only barred defendants from soliciting accounts they actively worked on while in plaintiff's employ). Perhaps acknowledging the weakness of its position, JCS advised this Court that while it "believes the original two year request is appropriate, a period of one full year running from the date of the court's decision seems reasonably calculated to protect JCS and its clients." (Letter from Anthony J. Ferrara dated May 22, 2001 at 3.)

The extreme breadth of the restrictive covenant is exemplified further by the fact that, apart from its racket customizing and stringing business, JCS engages in the retail, travel and concierge business. (Dep. of Jay Schweid dated March 26, 2001 ("Schweid Dep. II") at 62-63.) JCS's concierge business assists professional tennis players, agents, manufacturers or anybody related to a major tournament with arrangements at restaurants, nightclubs and shows. (Schweid Dep. II at 63.) Thus, beyond purporting to preclude Yu from working "anywhere on earth" in the tennis customizing industry, the restraint extends in similar geographic scope to the other enterprises of JCS without any apparent business justification.

Relatedly, <u>the restrictive covenant also aims to preclude Yu from soliciting the business of any client or prospective client of JCS.</u> (Yu Aff. Ex. C ¶ 2(d).) <u>JCS's definition of a prospective client appears to include any professional tennis player.</u> (*See* Schweid Dep. II at 95.) <u>As such, the restraint on solicitation is impermissibly broad and unenforceable as a matter of law. See Ivy Mar, 907 F.Supp. at 560.</u>

While tempted to exercise its discretion and "blue pencil" the restrictive covenant, *see Karpinski v. Ingrasci, 28 N.Y.2d 45, 51-52, 320 N.Y.S.2d 1, 6-7 (1971)*, this Court declines to do so. The dynamic, relationship-based nature of the tennis racket customizing industry and its lack of geographical boundaries strongly militates against a judicially-crafted agreement. The parties are best served by a modified agreement reached on mutual consent.

3. *State law claims*

\*8 For its breach of contract claim, JCS argues that Yu breached the Employment Agreement by engaging in tennis racket customizing and stringing within the prohibited time period and by soliciting JCS's customers and employees. JCS has not demonstrated a likelihood of success on this claim because, as discussed, the restrictive covenant is unreasonable in scope and duration. In addition, the evidence that Yu has solicited JCS's clients is insubstantial. While JCS asserts that Yu lured away two professional tennis clients, Tim Henman and Justin Gimelstob, the record evidence shows that Yu had no discussions with either of them. (*See* Yu Aff. ¶ 40.) In fact, Henman came to Priority One before Yu joined the company. (Yu Aff. ¶ 40.) Moreover, Yu denies that he solicited any of JCS's current employees to leave and join Priority One. (Yu Aff. ¶ 40.)

Likewise, JCS has not established on this record that Yu misappropriated any trade secrets. There is no evidence that Yu sought to commit to memory any of JCS's confidential business information before

2001 WL 761067  
144 Lab.Cas. P 59,393  
(Cite as: 2001 WL 761067 (S.D.N.Y.))

Page 6

leaving the company or that the database is being used to compete against JCS. While JCS points to the fact that Yu retained his laptop that holds a version of the JCS database, the record evidence shows that Yu is unable to access the information because the screen on his laptop is broken. Since leaving JCS, Yu only made one attempt to operate his laptop and did so in order to access personal e-mails; that attempt failed because he could not read the screen. Notably, the information stored on Yu's laptop is over seventeen-months old and many of the players' specifications are likely to be stale. (See Tr. at 58-59.) JCS also points to testimony that at one tennis tournament Yu showed Ferguson his JCS laptop. (See Van Asselt Aff. ¶ 9.) Yu admits doing so, but states that he only displayed to Ferguson the menu page to the database which contains no substantive information. (Yu Aff. ¶ 26.)

Since JCS has not established on this record that Yu solicited the company's customers on behalf of Priority One or misappropriated the company's confidential information, JCS also is unlikely to prevail on its claim for breach of fiduciary duty.

B. *Irreparable harm*

A showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983). The mere possibility of harm is not sufficient: the harm must be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied. *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990); *Earthweb,* 71 F.Supp.2d at 308. If irreparable harm is remote, speculative, or a mere possibility, the motion must be denied. See *Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991); *Reuters Ltd. v. United Press, Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). In the Second Circuit, irreparable harm may be presumed if a trade secret has been misappropriated. *Haber,* 188 F.3d at 49.

*9 Insofar as JCS has shown that the players' customizing specifications merit trade secret protection, JCS has not demonstrated on this record an imminent and likely risk of disclosure warranting preliminary injunction. Because the JART-based technology is patented and proprietary to JCS, JCS's customizing specifications have little or no value to competitors who have no access to the JART. See *Earthweb,* 71 F.Supp.2d at 310 (absent actual misappropriation by an employee, inevitable disclosure doctrine only applies where "the trade secrets at issue are highly valuable to both employers"). Schweid stressed in both his affidavit and oral testimony that without the JART, tennis rackets customized by JCS are "not readily reproducible without access to the data." (Schweid Aff. ¶ 13; see also Schweid Aff. ¶ 25 ("the tolerances and measurements of the racket cannot be readily reproduced without our expertise"); Tr. at 44 (testifying that "[s]wing weight numbers are difficult to use if you don't have a JART machine"). Emblematic of this point, Yu testified that Nate Ferguson applies different customizing techniques and that he would have to learn them before he could start customizing at Priority One. (Tr. at 81.) Ironically, it is the very uniqueness of the JART to the tennis industry, a byproduct of its patent protection, that prevents JCS from being able to show irreparable harm. Indeed, JCS finds itself in somewhat of a "Catch-22." Had JCS used conventional customizing methods, none of the racket specifications derived by JCS would enjoy trade secret protection. Once placed into the public domain, the rackets easily could be reproduced by a competitor. See *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1177 (2d Cir.1993), abrogated on other grounds, *Nadel v. Play-by-Play Toys & Novelties, Inc.,* 208 F.3d 368, 379 n. 9 (2d Cir.2000).

Along similar lines, JCS cannot show irreparable harm flowing from the imminent loss of clients. The evidence presented by JCS fails to tie Yu to the loss of the two clients it references, Henman and Gimelstob.

Conclusion

For the reasons stated, plaintiff's motion for a preliminary injunction is denied. Counsel are directed to appear for a pretrial conference on July 23, 2001 at 2:00 p.m.

SO ORDERED:

END OF DOCUMENT