# EXHIBIT 5

117 F.Supp.2d 336
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Page 1

▷

United States District Court,
S.D. New York.

Edward E. LUCENTE, Plaintiff,
v.
INTERNATIONAL BUSINESS MACHINES
CORPORATION, Defendant.

No. 99 Civ. 3987(CM).

Oct. 5, 2000.

Former employee sued former employer for payment of stock options and restricted stock granted to him over course of his employment but withheld by employer pursuant to noncompetition provisions of stock incentive programs. Former employer counterclaimed for severance payment it had made to former employee. Following denial of former employer's motion for judgment on pleadings, 75 F.Supp.2d 169, former employee moved for summary judgment and former employer cross-moved for partial summary judgment. The District Court, McMahon, J., held that: (1) shares of restricted stock were subject to noncompetition provisions; (2) employee choice doctrine did not apply so as to preclude examination of reasonableness of forfeiture-for-competition provisions with respect to restricted stock; (3) noncompetition clauses were unreasonable; (4) former employee was not required to return severance payment; (5) money damages rather than specific performance was appropriate remedy; (6) damages for failure to pay restricted stock would not be based on value of stock on date that former employer notified former employee it was canceling his outstanding restricted stock awards; and (7) former employee would be permitted to present to jury differences in value resulting from application of models accepted by modern finance theory for determining present value of option grants.

Order accordingly.

West Headnotes

[1] Contracts ⚿202(2)
95k202(2) Most Cited Cases

Under New York law, shares of restricted stock issued to employee, under plan stating that employer would be required to "make any payment due" upon employee's retirement subject to certain noncompetition provisions, were subject to the noncompetition provisions, notwithstanding employee's argument that restricted stock would be "delivered" rather than "paid" to employee, inasmuch as plan noted that noncompetition provisions were applicable to "the Plan."

[2] Contracts ⚿176(1)
95k176(1) Most Cited Cases

Under New York law, where the terms of an agreement are in dispute, it is a question of law for the court to determine the meaning of the contract.

[3] Evidence ⚿461(1)
157k461(1) Most Cited Cases

Under New York law, extrinsic evidence of the parties' intent is not required for a court to interpret the meaning of contract terms.

[4] Contracts ⚿116(1)
95k116(1) Most Cited Cases

Under New York law, employee choice doctrine did not apply to former employee's claim for restricted stock that former employer had withheld under noncompetition clause, and examination of reasonableness of forfeiture-for-competition provisions thus was not precluded, inasmuch as former employer had asked former employee to leave, had released him from noncompetition clauses at issue to facilitate his departure to work for second employer, and had failed to offer him reemployment when he faced forfeiture upon joining third employer.

[5] Contracts ⚿116(1)
95k116(1) Most Cited Cases

Under New York law, for an employer to show that it is appropriate to apply the employee choice doctrine, under which forfeiture under a noncompetition clause may be enforceable without regard to its reasonableness but only when the employee has the choice of remaining in the employ of the employer who seeks to restrict his or her moving to a competitor, the employer must show that it was willing to continue to employ the employee.

[6] Contracts ⚿116(1)
95k116(1) Most Cited Cases

Under New York law, the relevant inquiry when determining whether the employee choice doctrine

117 F.Supp.2d 336 \
17 IER Cases 525, 25 Employee Benefits Cas. 2769 \
(Cite as: 117 F.Supp.2d 336)

Page 2

applies, so as to preclude the examination of the reasonableness of forfeiture-for-competition provisions, is not whether the actual termination of the employer-employee relationship took the form of a resignation, retirement, or firing, but whether the employer, that is, the party seeking to enforce the non-compete agreement, was willing to retain the employee.

[7] Federal Civil Procedure ⚷2497.1 \
170Ak2497.1 Most Cited Cases

For employer to overcome summary judgment on issue whether employee choice doctrine applied under New York law to employee's claim for restricted stock that employer had withheld under noncompetition clause, employer was required to put on some evidence that it was willing to retain employee. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

[8] Contracts ⚷116(1) \
95k116(1) Most Cited Cases

Under New York law, even preliminary discussions and overtures cannot qualify as continued willingness to employ for purposes of determining whether the employee choice doctrine precludes the examination of the reasonableness of forfeiture-for-competition provisions.

[9] Contracts ⚷116(1) \
95k116(1) Most Cited Cases

Under New York law, an employer must be willing to retain an employee in his existing or a comparable position, with equivalent benefits, salary, and employment conditions for the employee choice doctrine to apply, precluding the examination of the reasonableness of forfeiture-for-competition provisions.

[10] Contracts ⚷117(9) \
95k117(9) Most Cited Cases

Under New York law, clauses requiring former employee to forfeit restricted stock and stock options upon entering into employment with former employer's competitor were unreasonable, in that they were unlimited in time, place, and scope, and former employer failed to identify any specific confidential or proprietary information that could have been unlawfully used in his employment with competitor.

[11] Contracts ⚷116(1) \
95k116(1) Most Cited Cases

Under New York law, noncompetition agreements involving employees are strongly disfavored on public policy grounds.

[12] Contracts ⚷116(1) \
95k116(1) Most Cited Cases

Courts apply a reasonableness standard under which a noncompetition agreement will be upheld under New York law only if it: (1) is not greater than required for the protection of the legitimate interests of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public.

[13] Contracts ⚷116(1) \
95k116(1) Most Cited Cases

Under New York law, a restriction imposed by a noncompetition agreement must be reasonable in time and area.

[14] Contracts ⚷116(2) \
95k116(2) Most Cited Cases

Before examining the reasonableness under New York law of a time and scope restriction in a noncompetition agreement, courts examine whether the employer has any legitimate interests to protect.

[15] Contracts ⚷116(1) \
95k116(1) Most Cited Cases

The forfeiture pursuant to a noncompetition clause of stock benefits received in an incentive award program receives less scrutiny from New York courts than the forfeiture of ERISA or other retirement benefits. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

[16] Contracts ⚷117(9) \
95k117(9) Most Cited Cases

[16] Contracts ⚷202(2) \
95k202(2) Most Cited Cases

Under New York law, former employee was not required to return severance payment to former employer upon going to work for former employer's competitor, inasmuch as letter from employer

117 F.Supp.2d 336  
17 IER Cases 525, 25 Employee Benefits Cas. 2769  
(Cite as: 117 F.Supp.2d 336)

Page 3

explaining severance payment did not explicitly condition payment on future noncompetition, former employer's officials did not tell former employee that payment was so conditioned, and, even if payment were so conditioned, such conditions would be unenforceable due to lack of limit on scope and duration.

[17] Contracts ⇐155  
95k155 Most Cited Cases

Under New York law, to the extent a contract might be found to be ambiguous on its face, it must be construed against the drafter.

[18] Specific Performance ⇐102  
358k102 Most Cited Cases

Under New York law, specific performance is a species of equitable relief. Restatement (Second) of Contracts § 359.

[19] Equity ⇐43  
150k43 Most Cited Cases

That a remedy at law may exist does not in itself preclude equitable relief under New York law.

[20] Specific Performance ⇐5  
358k5 Most Cited Cases

Under New York law, if a court finds that substantial justice cannot be achieved through the award of money damages, specific performance may be awarded.

[21] Specific Performance ⇐3  
358k3 Most Cited Cases

In considering whether to award specific performance under New York law, a court should consider all the circumstances of the case.

[22] Specific Performance ⇐70  
358k70 Most Cited Cases

Under New York law, money damages rather than specific performance was appropriate remedy for former employer's failure to pay former employee stock options and restricted stock, due to employer's erroneous interpretation of noncompetition provisions of stock incentive programs, inasmuch as it would not be equitable to order specific performance of options with reformed exercise periods, since relevant periods had long since expired and current circumstances were much more favorable to former employee than previously, and any award of shares of stock today would likewise prove inequitable.

[23] Damages ⇐208(1)  
115k208(1) Most Cited Cases

Method by which value of stock shares and options should be measured, for purposes of damages in employee's New York law action alleging wrongful denial of shares and options pursuant to noncompetition agreement, was issue that was required to be resolved by court rather than jury.

[24] Damages ⇐117  
115k117 Most Cited Cases

Under New York law, the general purpose of damages awards in a contract action is to place the injured party in the position in which he or she would have been had the contract not been breached.

[25] Damages ⇐62(4)  
115k62(4) Most Cited Cases

The general rule of New York law in a breach of contract case is that the plaintiff should not be compensated for any loss that he or she could have avoided upon learning that defendant had breached.

[26] Damages ⇐126  
115k126 Most Cited Cases

Under New York law, damages for former employer's failure to pay former employee restricted stock, due to former employer's erroneous interpretation of noncompetition provisions of stock incentive programs, would be higher of value of stock on date his shares would have been released from escrow, measured as date he would have received notice of their release from escrow, or highest intermediate value between date of release from escrow and end of reasonable period thereafter, inasmuch as it would be manifestly unreasonable to set as valuation of restricted stock the value of the stock on date that former employer notified former employee it was canceling his outstanding restricted stock awards.

[27] Damages ⇐126  
115k126 Most Cited Cases

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

117 F.Supp.2d 336                                                                                                   Page 4
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Under New York law, where the asset being contracted for is stock, the plaintiff's loss for purposes of a damages calculation arises from the failure to deliver the shares, and thus from the gains the plaintiff would made or loss he or she would have prevented by controlling the time to sell.

[28] Damages ⇌22
115k22 Most Cited Cases

Under New York law, where the loss from the breach of a contract is foreseeable by the party in breach, consequential damages may be awarded.

[29] Damages ⇌126
115k126 Most Cited Cases

Damages under New York law for former employer's failure to pay former employee stock options, due to former employer's erroneous interpretation of noncompetition provisions of stock incentive programs, would not be based on assumption that former employee would have exercised options at moment prior to expiration dates when former employer's stock traded at its higher value, and former employee instead would be permitted to present to jury differences in value resulting from application of models accepted by modern finance theory for determining present value of option grants, including Black-Scholes and binomial models.

*339 David R. Quittmeyer, Douglas L. McCoy, Hand Arendall, L.L.C., Mobile, AL, for Edward E. Lucente, plaintiff.

Peter T. Barbur, Cravath, Swaine & Moore, New York City, for I.B.M., defendant.

MEMORANDUM DECISION AND ORDER
GRANTING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT,
DENYING DEFENDANT'S CROSS-MOTIONS
FOR PARTIAL SUMMARY JUDGMENT ON
ISSUES OF
LIABILITY AND GRANTING IN PART AND
DENYING IN PART DEFENDANT'S CROSS-
MOTION FOR
PARTIAL SUMMARY JUDGMENT ON THE
MEASURE OF DAMAGES

McMAHON, District Judge.

*Summary*

Plaintiff Edward Lucente sued International Business Machines Corporation ("IBM") for payment of stock options and restricted stock granted to him over the course of his thirty years of employment with IBM, which IBM had withheld after Lucente took up employment with a competitor. Lucente moved for summary judgment on the grounds that IBM's non-competition provisions are not enforceable against him. IBM filed several cross-motions on issues of liability and damages. For the reasons stated below, Plaintiff's motion for summary judgment on the issue of liability is granted and the Defendant's cross-motions addressing liability are denied. Defendant's motion for partial summary judgment on the question of damages is granted in part and denied in part. A trial will be held to determine damages.

I
FACTUAL BACKGROUND
The following facts are undisputed:

Edward Lucente worked for IBM from 1961 until 1991. During the course of his 30-year employment at IBM, Lucente participated in several incentive award programs, including a program through which he was awarded certain restricted stock and another which awarded him stock options. The purpose of such awards is two-fold: to promote loyalty to the company, and to tie executive compensation to stock performance and thus to the profitability and growth of the company. As is typical of such executive incentive programs, Lucente's stock and stock option awards were subject to certain forfeiture-for-competition provisions, [FN1] which authorized IBM to cancel any deferred, unpaid or unexpired awards if Lucente ever went to work for any company that IBM deemed a competitor. The clauses contain no limitations for time, place and scope. These noncompete clauses state, in essence, that an executive is entitled to receive the awards for as long *340 as he remains in the employ of IBM or, in the event he leaves IBM, he does not do so to work for a company that competes with IBM.

FN1. Plaintiff disputes whether the 1982 Plan contemplates that the restricted stock be subject to forfeiture-for-competition. *See* discussion at Sec. II A.

By 1991, Lucente had been promoted to the position of President of the Asia-Pacific Operation, and was one of a handful of senior executives reporting directly to the CEO, John Akers. In late 1990,

117 F.Supp.2d 336 Page 5
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Akers, unhappy with the results in the Asia-Pacific Division, told Lucente that it would be in the best interests of both Lucente and IBM if Lucente sought employment elsewhere. (Akers Dep. at 95). Lucente, believing that he was being asked to leave IBM, pursued an opportunity at Northern Telecom. With the express understanding from Akers and IBM that his move to Northern Telecom would be deemed not to be competitive with IBM (and thus would not trigger forfeiture of his long-term compensation package), Lucente retired from IBM in February 1991. As part of his retirement package, IBM paid Lucente a lump-sum severance equivalent to approximately one year's salary, or $675,000. Lucente worked for Northern Telecom in the position of Senior Vice President, Marketing until November 1992, when he announced his resignation, to take effect March 1993.

On April 14, 1993, Lucente joined Digital Equipment Corporation ("Digital"), where he worked for approximately one year. On April 15, 1993, IBM notified Lucente that IBM was canceling his outstanding stock options and restricted stock awards, because IBM deemed Lucente's employment at Digital to be "competitive employment." (Letter to Lucente from Donald Edman, Apr. 15, 1993, attached to Plaintiff's Aff. as Exh. 1.) IBM did not demand reimbursement of the $675,000 severance payment at that time.

Over the years, Lucente has sought, without success, to have IBM reverse the forfeiture decision. He filed this suit on February 24, 1999.

*Procedural History*

Lucente sued for breach of contract to recover restricted stock and stock options, damages and related relief. IBM filed two counterclaims: (1) to recover the $675,000 severance payment IBM made to Lucente in 1991, and (2) to recover payments IBM made on behalf of Lucente to a tax reconciliation account maintained while he was an IBM employee. Lucente has conceded that IBM should prevail on the later counterclaim. He emphatically contests the former.

IBM moved under Fed.R.Civ.P. 12(c) for judgment on the pleadings. This Court denied IBM's motion, except with respect to the uncontested tax reconciliation claim, which Plaintiff has satisfied. See *Lucente v. IBM*, 75 F.Supp.2d 169 (S.D.N.Y.1999) Familiarity with this opinion is presumed. In pertinent part, I observed that forfeiture for competition clauses were sometimes enforceable under New York law without regard to their reasonableness, but only when the employee had the choice of remaining in the employ of the employer who seeks to restrict his moving to a competitor. *Id.* at 172-173 (discussing *Post v. Merrill Lynch, et al.*, 48 N.Y.2d 84, 421 N.Y.S.2d 847, 397 N.E.2d 358 (1979)). And I concluded that judgment on the pleadings would be inappropriate because nothing in the pleadings suggested that IBM either did or would have offered Lucente such a choice in the unusual circumstances of the case. *Id.* at 174.

Following discovery, Plaintiff now moves for summary judgment on all his claims and for summary judgment dismissing IBM's counterclaim for return of the severance payment. Instead of confining its arguments to the opposition papers to Plaintiff's motions that it filed, IBM has taken the tack of filing four additional separate motions for partial summary judgment to resolve the various legal issues in the case. This was a blatant attempt by IBM to circumvent this Court's *341 rules on page-limits for motion papers and briefs. IBM's papers were duplicative. They were also far less persuasive than Plaintiff's concise opposing papers, which came well within the page limitations.

First, IBM seeks a declaration that the restricted stock awards are subject to forfeiture-for-competition under the terms of IBM's variable compensation plan. Second, IBM moves for a declaration by the Court that, so long as Lucente had a choice to remain at IBM when he retired in 1991, the employee choice doctrine applies to IBM's cancellation of his stock options and restricted stock in 1993, and precludes any inquiry into the "reasonableness" of the relevant forfeiture-for-competition provisions. Third, IBM moves for partial summary judgment on the proper measure of damages or, in the alternative, *in limine* to exclude the expert report and testimony of John Vaught, which underlies Plaintiff's damages claim. Fourth, IBM moves for dismissal of Plaintiff's statute of limitations, laches and estoppel defenses to its counterclaim. The first and second motions address the legal issues at the heart of Lucente's claim and are disposed of in connection with Plaintiff's motion for summary judgment. The issues raised in the fourth motion were briefed by Plaintiff in his motion for summary judgment on the counterclaim and are therefore addressed in the discussion of that claim. I address the question of damages last.

II
PLAINTIFF'S MOTION FOR SUMMARY

117 F.Supp.2d 336
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Page 6

## JUDGMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247- 50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. See *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. See *id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because the record before this Court is devoid of any evidence from which a reasonable jury could find in favor of the Defendant on any of Plaintiff's claims for breach of contract, summary judgment is granted to Plaintiff on the issue of liability.

A. *The Restricted Stock was Subject to Noncompete Provisions*

It is undisputed that between 1981 to 1990, Lucente was awarded 11,162 shares of restricted stock under the "IBM Variable Compensation Plan" (the "1982 Plan") and a predecessor plan, and 1,121 restricted shares under the "IBM Long- Term Performance Plan" (the "1989 Plan"). (Answer ¶ 3; Plaintiff's Mem. of Law in Support of Motion for Summary Judgment, Exh. 4.) It is also undisputed that from 1983 to 1991, Lucente was awarded options for 126,739 shares of IBM stock pursuant to the 1989 Plan. (Plaintiff's Mem. of Law in Support of Motion for Summary Judgment, Exh. 5.)

1. *The 1982 Plan*

[1] As a threshold matter, Plaintiff argues that the 11,162 shares issued to him under the 1982 Plan are not subject to forfeiture for competition, and that he is thus entitled to those shares as a matter of law. Lucente's argument is based on the fact that the forfeiture for competition clause of the 1982 Plan refers only to conditions placed on awards for which IBM is obligated to "make payment" as opposed to awards that IBM "delivers" to *342 the employee. He contends, in essence, that, because stock certificates are "delivered" and cash awards are "paid," the noncompete does not apply to stock awards. Defendant counters that the clear and unambiguous terms of the 1982 Plan place a forfeiture-for-competition condition on Lucente's shares.

[2] This Court has already held that New York law governs the agreements at issue here. See *Lucente,* 75 F.Supp.2d at 172. Where the terms of an agreement are in dispute, it is a question of law for the Court to determine the meaning of the contract. See *Helmsley-Spear, Inc. v. New York Blood Center, Inc.,* 257 A.D.2d 64, 68, 687 N.Y.S.2d 353, 356 (1st Dept.1999) ( "Interpretation of an unambiguous contract provision is a function of the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.") (internal quotation omitted). "It is axiomatic that vague or ambiguous contract language must be construed against the drafter." *U.S. v. Manshul Constr. Corp.,* 940 F.Supp. 492, 499 (E.D.N.Y.1996). "In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it and favorably to a party who had no voice in the selection of its language." *Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283 (1985). Anything less than total clarity, "even some level of ambiguity, will result in construction favoring [the nondrafter]." *Prescott, Ball & Turben v. LTV Corp.,* 531 F.Supp. 213, 217 (S.D.N.Y.1981). Applying these standards, and construing all ambiguities against IBM, I find that the restricted stock awarded under the 1982 Plan is subject to forfeiture for competition.

The 1982 Plan defines "Restricted Stock" as "Stock which is awarded to an employee pursuant to the limitation contained in paragraphs 7, 8 and 12 below." (Bursor Decl.Exh. 2, ¶ 2(i)). However, under the heading "General Information Regarding the Plan" the Plan states that "[r]estrictions on transferability, and conditions of forfeiture of awards are contained in paragraphs 7(c), 8, 12 and 13 of the Plan." (*Id.* at p. 3.) Paragraphs 7, 8 and 12 make no reference to noncompetition. Paragraph 7 states in relevant part:
> After award of Restricted Stock, certificates for such shares will be deposited in escrow with the IBM Treasurer. The employee shall retain all rights in the Restricted Stock while it is held in escrow including but not limited to voting rights and the right to receive dividends, except that the employee shall not have the rights to transfer or assign such shares until all restrictions pertaining to such shares are terminated at which time the

117 F.Supp.2d 336  
17 IER Cases 525, 25 Employee Benefits Cas. 2769  
(Cite as: 117 F.Supp.2d 336)

Page 7

applicable stock certificates shall be released from escrow and delivered to the employee by the IBM Treasurer.
(*Id.* ¶ 7.) The only restriction in Paragraph 8 is that "the Committee will establish the period or periods after which the Restrictions on Restricted Stock will lapse." (*Id.* at ¶ 8.) Paragraph 12, entitled "Restrictions and Forfeiture," states in its entirety:

> The Company's obligation to *make payments* due hereunder or to *deliver stock* certificates held in escrow is subject to the condition that the employee remain and active employee of the Company for the entire deferral and/or restriction period, including mandatory and optional deferrals or until the employee's death, total and permanent disability, or retirement under a Company retirement plan if any of those events should sooner occur. If the employee fails to meet this condition, the employee's right to any such *unpaid amounts or undelivered stock* certificates shall be forfeited. This provision may be waived by the Committee in exceptional circumstances.

(*Id.* ¶ 12.) (emphasis added)

The only restriction in Paragraph 12 that was applicable to Lucente was that he remain an active employee until the time *343 of his retirement or until the expiration of the restriction period, whichever came first. IBM does not dispute that the first of these events to occur was Lucente's "retirement" under a plan agreed to by IBM, and that he was an active employee until the time of his retirement. Lucente therefore appears to have met the restrictions discussed in Paragraph 12.

Furthermore, Paragraph 12 clearly distinguishes between payment, which has to do with money, and delivery, which has to do with stock certificates. Plaintiff asserts that this distinction is important, because the noncompete clause of the 1982 Plan, which is contained in Paragraph 13, discussed only the payment of money, not the delivery of stock. Defendant contends that the noncompetition provisions of Paragraph 13 apply to all awards made under the 1982 Plan. I agree.

The relevant portion of Paragraph 13, entitled "Retirement" reads:

> If the employee retires under a Company retirement plan, the Company's obligation *to make any payment due* thereafter under this Plan is subject to the Condition that for the entire period of deferral or restriction: [discussing noncompetition provisions].

(*Id.* ¶ 13.)

The definition of "Restricted Stock" clearly states that it is subject to the restrictions of Paragraphs 7, 8 and 12. Thus, under the doctrine of *inclusio unis es exclusio alteres,* it would appear that the 1982 Plan did not contemplate applying the restrictions discussed in Paragraph 13 to Restricted Stock awards. Defendant argues, however, that, because the "General Information" clearly notes that the restrictions of Paragraph 13 are applicable to "the Plan," generally, it must also apply to Restricted Stock:

> Restrictions on transferability, and conditions of forfeiture of awards, are contained in paragraphs 7(c), 8, 12, and 13 of the Plan.

(*Id.* at p. 1). Defendant's reading is the only one that makes sense here, as it is the only interpretation of the contract that allows the Court "to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract." *Helmsley-Spear,* 257 A.D.2d at 69, 687 N.Y.S.2d at 357.

[3] I further find that the inclusion of the language "stock delivery or payment" in Paragraph 12 and the abbreviated reference to "payment" in Paragraph 13, also does not render the noncompetition provisions of Paragraph 13 inapplicable to restricted stock. The 1982 Plan is replete with reference to "payment" in conjunction with restricted share awards. For example, Paragraph 7, discussed *supra,* is entitled "Payment of Awards," and includes "award of Restricted Stock." (*Id.* at ¶ 7.) Thus, the fair meaning of "payment" should be construed as including an "award" of shares. And, Defendant is correct that IBM's failure to name one former employee whose Restricted Stock was forfeited for alleged noncompetition does nothing to change this outcome; extrinsic evidence of the parties' intent is not required for a court to interpret the meaning of contract terms.

B. *The "Employee Choice" Doctrine Does not Apply*

[4] Plaintiff argues that the employee choice doctrine does not apply for two reasons: (1) his departure was not "voluntary" for purposes of applying the employee choice doctrine, and (2) even if his departure from IBM could be deemed voluntary, the fact that IBM allowed Lucente to work for Northern Telecom renders the employee choice doctrine inapplicable to his subsequent employment with Digital--because IBM was not willing to employ Lucente at the time it cancelled the stock.

117 F.Supp.2d 336            Page 8
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Defendant responds that Lucente's departure from IBM was voluntary and that, as such, the New York employee choice doctrine should be applied to Lucente's forfeiture of the stocks and options. Defendant *344 argues that, as long as Lucente had the choice to remain with IBM when he left in 1991, the employee choice doctrine applies and precludes examination of the reasonableness of the forfeiture-for-competition provisions. As IBM frames the argument, "Lucente had the choice either to remain at IBM or to retire knowing that, to the extent he thereafter sought to work, he could not both work for a competitor and retain his IBM-granted stock options and restricted stock." (Def.Mem. for Partial Summary Judgment on Employee Choice Doctrine at 14-15.) Moreover, IBM contends that the decision to go to Digital in 1993 was a replay of the choice he had in 1991, i.e., to take a job with a competitor and give up the stock benefits. IBM therefore concludes that Lucente's voluntary retirement places this case squarely within the employee choice doctrine.

After reviewing the record before me, I hold that no reasonable juror could conclude that Lucente left IBM voluntarily. Thus, the employee choice doctrine does not apply.

[5][6] To find that the employee choice doctrine applies, an employer must show that it was willing to continue to employ the employee. See _Merrill Lynch_, 48 N.Y.2d at 89, 421 N.Y.S.2d at 849. The relevant inquiry is not whether the actual termination of the employer-employee relationship took the form of a resignation, retirement or firing, but whether the employer--the party seeking to enforce the non-compete agreement--was willing to retain the employee. For if an employer is not willing to keep an employee on, the employer would be hard pressed to justify the noncompete on the grounds of promoting long-term employee loyalty and retention or creating economic incentives for employee productivity.

[7][8][9] Courts have therefore been strict in requiring that employers put on evidence of their willingness to retain the employee before triggering the employee choice doctrine. Therefore, to overcome summary judgment, IBM must put on some evidence that it was willing to retain Lucente. Even "preliminary discussions and overtures" cannot qualify as continued willingness to employ. See _SIFCO Industries, Inc. v. Advanced Plating Technologies, Inc._, 867 F.Supp. 155, 158 (S.D.N.Y.1994). Moreover, the employer must be willing to retain the employee in his existing or a comparable position, with equivalent benefits, salary and employment conditions. See _Id._

In SIFCO, the defendants were senior employees at a manufacturing plant that was purchased by plaintiff. The plant closed. SIFCO offered to retain each defendant as a consultant for a two-year period, but the offer was refused. SIFCO thereafter sought to enforce a noncompetition provision against the defendants, who started their own competing business. The court held that, because SIFCO could not come up with enough evidence to show that it offered to continue the defendants in their previous, or comparable, positions, with comparable salaries, employment conditions, and benefits, the noncompetition covenants were unenforceable as a matter of law. [FN2] See _Handel v. Nisselson_, No. 98 Civ. 6662, 1998 WL 889041, *3 (S.D.N.Y. Dec. 18, 1998) ("[I]n enforcing a non-competition covenant, a court must first find that the employer was willing to continue providing employment to the employee.")

> FN2. Judge Schwartz was clear that this lack of evidence sufficed to permit an award of summary judgment in favor of defendants. 867 F.Supp. at 159 fn. 4 (citing _Weintraub v. Schwartz_, 131 A.D.2d 663, 516 N.Y.S.2d 946, 948 (2d Dept.1987)).

The evidence in the record is as follows: Lucente was one of a handful of IBM executives who reported directly to the CEO, John Akers. Although all the other division heads also carried the title "Senior Vice President," Lucente's title was Vice President. Lucente himself testified that he had two or three conversations with *345 Akers in which Lucente's departure form IBM was discussed. In September or October 1990, Akers visited Lucente in Japan, and told Lucente that he (Lucente) had "some serious problems with other members of the top management team." (Lucente Dep. at 109).

During a trip back to the United States in November 1990, Lucente met with Akers again, at which time Akers told Lucente that he had lost confidence in him and that Lucente was losing support from other members of the corporate management board. (_Id._) During that same conversation, Akers told Lucente to start planning his return to the United States from Japan. According to Lucente, Akers told him that he would not have a job for Lucente and he encouraged Lucente to consider employment elsewhere.

117 F.Supp.2d 336
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Page 9

(Lucente Dep. at 110, 121). As Lucente recalled the conversation, he was told by Akers that he had no future left at IBM. (*Id.* at 121-125). Akers asked him if he had considered anything outside IBM. Lucente told him that he had been made an offer from Carnegie-Mellon University and that he had also held some conversations with Paul Stern, the CEO of Northern Telecom. [FN3] Akers discouraged Lucente from the academic job, but indicated that perhaps something could be worked out whereby IBM would not consider Northern Telecom to be a competitor. (*Id.* at 111.)

> FN3. Defendant attempts to make an issue put of the fact that Lucente's first contact with Northern Telecom occurred in Summer of 1990, well before these conversations with Akers. It is clear from the record, however, that Lucente was contacted by a headhunter--a commonplace occurrence in the corporate world--who had suggested an exploratory meeting with Paul Stern. There is no indication in the record that Lucente planned to leave IBM until after his discussions with Akers in the Fall of 1990. (Lucente Dep. at 119).

John Aker's deposition testimony substantially confirms Lucente's recollection of the conversations:
> Q. What do you recall discussing with Mr. Lucente about what he would do for IBM after you brought him back from Tokyo?
> A. ... and I said, well, *I don't think you are going to get a job that's at the same level that you've been working in terms of responsibilities, maybe something less....*
> Q. Did you ever formulate more specifically in your mind what position you had available for Mr. Lucente which was of a lesser responsibility?
> A. No.
> Q. Did you ever tell Mr. Lucente what options you were considering in terms of a position for him after Asia-Pacific of lesser responsibility?
> A. Not in the specific.... *I personally felt that it would be better for him to leave* because he had a shot at being successful to the degree he wanted to be with a new repotting, if you will....
> Q. Tell me what you can recall about your discussions with Mr. Lucente about the kinds of jobs he might have at IBM should he choose to stay with the company.
> A. Well, I don't remember the specifics and we did not get into the specifics....
> Q. But certainly a position of lesser significance in the company in your view and in Mr. Lucente's view than the positions he had previously been occupying?
> A. That's correct.
> Q. Do you recall any specifics about which of those types of staff jobs you discussed with Mr. Lucente as being possible--
> A. I did not. I don't think I did.
> Q. You didn't discuss specific staffs where he might be employed?
> A. No.
> Q. *Did you conclude that is was in IBM's best interest that Mr. Lucente *346 seek employment outside the company?*
> A. *I think I did. I thought it was in IBM's best interest.*
> Q. *Did you communicate that to Mr. Lucente?*
> A. *Yes, I did.* I am sure I did.
> (Akers Dep. at 87-96) (emphasis added).

In the first week of December 1990, Lucente returned again to the U.S. to discuss his operating plan for Asia and the outlook for the Asia division in the coming year. Akers told Lucente--in a group meeting--that his plan was unacceptable. Later that evening, Akers called Lucente and told him that he would be sending Ned Lautenbach to Japan to help with the plan and the Asia operation as an assistant group executive. (*Id.* at 112-113.) Akers later testified that, at the time he was encouraging Lucente to leave IBM, he was intending to replace Lucente with Lautenbach. (Akers Dep. at 18.) Lucente took this--quite correctly as it turned out--as the final signal that Akers wanted him out of IBM. Between that date and the end of the 1990, Lucente held several meetings with Paul Stern and other Northern Telecom executives. He reached an agreement with Northern Telecom the third week of December.

Shortly thereafter, Lucente met with Akers for the last time. He told Akers of his offer from Northern Telecom, and Akers agreed that IBM would announce Lucente's departure from IBM in a way that preserved some dignity. (*Id.* at 114.) The terms of his separation from IBM were discussed, but Lucente told Akers he would be more comfortable if Lawrence Gutstein, IBM's Director of Officer Services, [FN4] handled the details of the terms. Lucente joined Northern Telecom and IBM paid him substantial severance; IBM did not cancel any of the stock options or restricted stock to which Lucente was entitled as part of his long-term compensation package.

117 F.Supp.2d 336
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Page 10

FN4. In this position, Gutstein was responsible for discussing with departing executives the details of their retirement packages.

Putting the best possible spin for IBM on Akers' testimony, he told Lucente that IBM might have "something less" than Lucente's then-level of responsibilities for him when he returned from Japan. (Akers Dep. at 87). Under *SIFCO,* the fact that Lucente could expect such a demotion bars invocation of the employee choice doctrine. To overcome Plaintiff's motion for summary judgment, IBM must make a showing that it was willing to maintain Lucente at the same or a comparable level of responsibility and compensation. I find no evidence in the record to indicate that IBM was willing to continue to employ Lucente at the same level of responsibility and compensation when he left for Northern Telecom in 1991. On the contrary, the only fair inference a reasonable jury can draw from the record before me is that Akers asked Lucente to leave. That he expressed that desire somewhat euphemistically (deploying language with which anyone active at the highest levels of corporate America is familiar) is irrelevant, as is the fact that Lucente was allowed to "retire." Akers testified that "[t]he practice of the IBM Company is not to terminate people," (Akers Dep. at 125), and during Akers' time as CEO, not one high-level IBM executive was "terminated," but several took "early retirement." (*Id.* at 111-112). Nonetheless, IBM wanted Lucente gone. It therefore may not invoke the employee choice doctrine.

This conclusion is further supported by the undisputed fact that, despite acknowledging that Northern Telecom is a direct competitor of IBM (Akers Dep. at 101-102) [FN5], *IBM chose to release Lucente from the restraints of the noncompetition clauses at issue here in order to facilitate his departure from IBM.* IBM's contention--*347 that Lucente was presented the choice between remaining at IBM and retaining his stock options or leaving with the knowledge that working for a competitor would lead to forfeiture--does not comport with the facts. Lucente was explicitly told that, when he left IBM, he could go to Northern Telecom--an IBM competitor--without giving up his stocks and options. This is not the "choice" contemplated by the doctrine.

FN5. When asked if the ROLM division of IBM and Northern Telecom were in the same business, Akers responded "I believe it was. Or close to it." (Akers Dep. at 101-102.)

The question, then, becomes, whether IBM gave Plaintiff a "choice" in April 1993, when he faced forfeiture of his benefits for joining Digital. The answer is no.

On this point, *Murphy v. Gutfreund,* 583 F.Supp. 957 (S.D.N.Y.1984), is instructive. Vincent Murphy had been a partner at Solomon Brothers. He then left to accept a position at Merrill Lynch. Prior to moving to Merrill Lynch, Murphy had asked John Gutfreund, the managing partner of Salomon, whether Salomon would deem Murphy's work at Merrill Lynch to be competitive. Gutfreund responded that "the Executive Committee would raise no objections to his association with Merrill Lynch because the Committee believed that he would not be competing with Salomon." *Id.* at 960. Later, however, after Murphy had already accepted his position at Merrill Lynch, Salomon changed its mind and decided that Murphy was competing. Salomon then attempted to use this supposed competition as a basis to deny Murphy an annual annuity paid to all former Salomon partners. *Id.* Murphy challenged Salomon's decision. Salomon attempted to defend on the basis of the employee choice doctrine.

Judge Lasker of this Court rejected Solomon's argument, finding that Murphy had been denied any meaningful choice, because he had already detrimentally relied on Gutfreund's representation and accepted a position at Merrill Lynch before the moment came for him to make his "choice":

> The 'employee choice' doctrine can only be fairly applied when the employee may choose between accepting benefits and working for a competitor at a time before the employee has made a commitment to either option. It follows that it does not apply, here, where the employee has been told by the former employer that his new position was not in competition with that employer who later offers the employee the choice of quitting the new position or accepting a proffered annuity.

583 F.Supp. at 965.

The only difference between *Murphy* and the case at bar is that IBM did not change its mind about Lucente's joining Northern Telecom. Rather, IBM decided to cancel the stocks and options only after