117 F.Supp.2d 336  
17 IER Cases 525, 25 Employee Benefits Cas. 2769  
(Cite as: 117 F.Supp.2d 336)

Page 11

learning of Lucente's move to Digital, a different (and presumably more threatening) competitor. But that is a distinction without a difference. There is no evidence that IBM, learning of Lucente's planned move came to him and offered him employment. Indeed, it is undisputed that IBM *did not intend to rehire Lucente in 1993.* (*See* Evangelista Dep. at 65-66; Burdick Dep. at 150.) [FN6] Thus, the employee choice does not apply to that decision either.

> FN6. Akers testified: Q. [D]uring the time when you were still CEO of IBM, did you have a job for Mr. Lucente at IBM that you wanted to hire him and place him in?
> A. You are asking me if I had a job for Lucente in 1993? And that I wished to hire him?
> Q. Yes.
> A. No.
> Q. In 1991 you believed that it was in the best interest of IBM for Mr. Lucente to take early retirement from the company. In 1993, did you continue to be of the opinion that is was in IBM's best interest that Mr. Lucente stay in retirement from IBM as opposed to active employment.
> A. It never crossed my mind.
> Q. It never crossed your mind that the company would have a desire to hire him back in to active employment.
> A. No.
> (Akers Dep. at 142-143).

*348 Because IBM has failed to put on any evidence that it was willing to continue to employ Lucente--either in 1991 or 1993--I conclude that the employee doctrine does not apply to this case.

C. *The Non-Compete Agreements are Unenforceable as a Matter of Law*

Where the employee choice doctrine is not implicated, the Court must examine the reasonableness of the noncompete agreements.

[10] The forfeiture for competition provision in the 1982 Plan reads in pertinent part:
> The employee shall not render services for any organization or engage directly in any business which, in the opinion of the Board, competes with, or is in conflict with, the interest of, the Company.

(Bursor Decl. at Exh. 2). The 1989 Plan states:
> A participant shall not render services for any organization or engage directly or indirectly in any business which, in the judgment of the Chief Executive Officer of the Company or other senior officer designated by the Committee is or becomes competitive with the Company, or which organization of business, or the rendering of services to such organization of business, is or becomes otherwise prejudicial to or in conflict with the interest of the Company.

(*Id.* at Exh. 1). Each of these provisions places a prohibition on competitive employment that is unlimited in time, place and scope. They bar plan participants from accepting employment at competing companies at any time, without forfeiting their accrued and vested benefits. Under New York law, such an agreement is unreasonable on its face.

[11] Under New York law, noncompetition agreements involving employees are strongly disfavored on public policy grounds:
> [O]ur economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restriction should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment. This includes those techniques which are but 'skillful variations of general processes known to the particular trade.'

*Reed, Roberts Associates, Inc. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590 (1976).

[12][13][14] Courts apply a reasonableness standard, under which a noncompetition agreement will be upheld only if it (1) is not greater than required for the protection of the legitimate interests of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *See Bdo Seidman v. Hirshberg,* 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d 854, 857, 712 N.E.2d 1220 (1999). The failure of any of these three prongs renders the covenant invalid. *Id.* The first element requires that the restriction be "reasonable in time and area." *Id.* But before examining the "reasonableness" of the time and scope restriction, courts examine whether the employer has any legitimate interests to protect:
> Only after determining that a restrictive covenant would serve to protect against such 'unfair and illegal' conduct and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of it 'time, space or scope,' or the oppressiveness of its operation become an issue.

117 F.Supp.2d 336                                                                                                             Page 12
17 IER Cases 525, 25 Employee Benefits Cas. 2769
**(Cite as: 117 F.Supp.2d 336)**

_American Institute of Chemical Engineers v. Reber-Friel Co., 682 F.2d 382, 387 (2d Cir.1982)_ (quoting _American Broadcasting Companies, Inc. v. Wolf, 52 N.Y.2d 394, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981))._ <u>Courts will enforce employment restrictions "only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential *349 customer lists," or "confidential customer information." _Id._</u>

Plaintiff argues that IBM has failed to show any legitimate interest that was served by its forfeiture decision made more than two years after Lucente left IBM. In response, IBM reiterates that it has the interest of retaining employees and promoting loyalty. However, when questioned in their depositions for this case, IBM executives could come up with no specific response to the question of what particular information, trade secrets, or proprietary rights were being protected by enforcing a noncompete against Lucente more than two years after he left IBM. The only thing they suggested was that purported competitors should not be allowed to benefit from Lucente's general expertise. For example, Akers testified that he did not know what information Lucente had when he left in 1991 (Akers Dep. at 46), and that he did not know if Lucente had any strategic, sensitive information regarding IBM in April of 1993 when the forfeiture was declared. (_Id._ at 47.) (_See also_ Stone Dep. at 181-83) (noting that the skills valuable to Digital were Lucente's "management, executive and marketing skills"); (Evangelista Dep. at 127-29).

<u>IBM has not identified any specific or confidential or proprietary information that Lucente had in 1993 that could have been unlawfully used in his employment at Digital.</u> Lucente's innate management skills and general know-how are exactly the kind of information that cannot be restricted through a covenant not to compete. _See Paramount Pad Co., v. Baumrind,_ 4 N.Y.2d 393, 397, 175 N.Y.S.2d 809, 151 N.E.2d 609 (1958); _Reed Roberts Associates, Inc. v. Strauman,_ 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677, 680-81, 353 N.E.2d 590. Further, any specific information about IBM and the computer industry would not warrant ongoing protection of a noncompete that is unrestricted in time. And, the only conclusion one can reach from the fact that IBM blessed Lucente's move to Northern Telecom is that they--were not concerned about Lucente's taking the marketing and management skills he had acquired during his 30 years with IBM to a competitor. (_See_ Burdick Dep. at 100.) (Lucente had "current knowledge about the family jewels [in 1991] when he left [IBM].") Indeed, Akers hoped that Lucente would flourish through a "repotting." (Akers Dep. at 87.)

Plaintiff also notes that, at the time of his departure from IBM in 1991, he was subject to a confidentiality agreement that covered trade secrets and confidential information. This agreement was totally separate from any noncompetition provisions relating to his restricted stock and stock options. (_See_ Termination Letter dated Feb. 21, 1991, and Letter dated Feb. 28, 1991, attached to Pl's Mem. at Exhs. 7 & 8.) The existence of these separate confidentiality agreements demonstrates that the enforcement of the noncompete would not have been necessary to insure that Lucente did not pass trade secrets and confidential information to Digital.

[15] IBM is correct that the type of benefits subject to forfeiture in these incentive award programs receives less scrutiny from courts than the forfeiture of ERISA or other retirement benefits. For example, in _York v. Actmedia, Inc.,_ 88 Civ. 8763, 1990 WL 41760, (Mar. 30, 1990 S.D.N.Y.), Judge Griesa held that a forfeiture of stock options was valid where the former employee had signed an agreement not to compete for two years following his departure. In contrast, after _Murphy,_ it is unlikely that any noncompete conditions placed on an employee's receipt of retirement benefits would be declared per se unreasonable. However, "golden handcuff" awards, like those at issue here, are the kind of icing on the cake that encourages executives to remain loyal and stay at the company by giving them long-term opportunities for significant wealth accumulation. In light of a company's desire to retain and reward employees, such conditions may be found to be reasonable. *350 But they are not reasonable here, precisely because IBM unlocked the handcuffs and released Lucente. Once it had removed those handcuffs in 1991, IBM could no longer argue that the stated purpose of its plans--"to retain" and "reward" selected key employees--justified the restriction.

For these reasons, I hold the noncompetition clauses in the 1982 and 1989 Plans, and any predecessor plans affecting Lucente's incentive pay, are unreasonable as a matter of law. As a result, IBM breached its obligation to Lucente when it cancelled his restricted stock and stock option awards made under the terms of those plans.

Having determined the clauses to be unreasonable, it

117 F.Supp.2d 336
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Page 13

is unnecessary to address Plaintiff's additional argument that IBM violated Plan procedures when it cancelled his benefits. The only issue remaining on the breach of contract claim is the measure of damages to which Lucente is entitled. Unfortunately, it is not an uncomplicated one.

### III
### IBM'S COUNTERCLAIM

[16] Plaintiff moves for summary judgment dismissing IBM's counterclaim for the 1991 severance payment on the grounds that (1) the text of his severance letter does not place any conditions on the severance payment, (2) even if the noncompete provision did apply to the severance payment, it is unreasonable as a matter of law. Having already determined that the employee choice doctrine does not apply to the facts of this case, I conclude that Plaintiff is correct and dismiss the counterclaim.

On February 21, 1991, IBM made a severance payment to Lucente in the amount $675,000. This payment was referred to in a stand-alone paragraph in the letter dated February 21, 1991, signed by Walter E. Burdick, Senior Vice President, Personnel, as follows:

> In connection with your retirement from IBM, we will pay you a special payment of $675,000 (less all applicable FIT and FICA, state and local taxes) in March 1991.

(Bursor Decl. at Exh. 3.) Burdick went on to state in the next paragraph that the severance payment was made "exclusive of your entitlement to income from the IBM Retirement Plan or any other benefits to which you are entitled as an employee electing early retirement in accordance with IBM benefit plans." (*Id.*)

The issue of competing employment was made in a separate paragraph:

> Following your retirement, other than your employment with Northern Telecom, which we deem not to be competitive or in conflict with the best interests of IBM *based on the facts of your situation,* you shall not engage in any activity as an employee, consultant, or director, personally or with any firm or organization, that is or becomes, in IBM's sole opinion, a competitor of IBM or its subsidiaries, or is otherwise prejudicial to or conflicts with the interests of IBM. This agreement is in addition to the provisions of the IBM Employee Confidential Information and Invention Agreement (and/or the IBM Agreement Regarding Confidential Information and Intellectual Property). Your outstanding stock options and restricted stock continue to be subject to the Termination of Employment sections of the IBM Stock Options Plans, the 1989 Long-Term Performance Plan, and the IBM Variable Compensation Plan.

(*Id.*) (emphasis added). Lucente signed this letter to indicate his agreement with its terms.

In 1993, at the time Lucente joined Digital, IBM informed Lucente that it was terminating his restricted stock and stock options packages. It said nothing to Lucente about forfeiture of the severance payment. In fact, this counterclaim arose only in the context of this litigation, and appears to have been made to retaliate *351 against Lucente for suing IBM on the stock package. The gravamen of the counterclaim is that, by taking up employment with Digital, Lucente violated the terms of the severance payment. I find the counterclaim entirely without merit.

[17] The Burdick letter does not explicitly condition the severance payment on future non-competition, a point this Court made in its earlier opinion. The paragraph awarding Lucente severance does not say anything about forfeiture for competition. The noncompetition language in the letter appears in a separate paragraph, which makes no reference whatsoever to the severance payment. The agreement seems clear enough on its face--it attempted to reinforce IBM's unreasonable and unenforceable non-competition clause, but set out no explicit penalty therefor. And, to the extent the letter might be found to be ambiguous on its face, it must be construed against the drafter, IBM. See *U.S. v. Manshul Constr. Corp.,* 940 F.Supp. 492, 499 (E.D.N.Y.1996). I therefore conclude that the separate paragraph discussing noncompetition placed no condition on the payment of severance.

If parol evidence were needed to help clarify matters, that evidence would support dismissal of the counterclaim. Burdick testified that he did not tell Lucente that the severance payment was subject to a non-compete. (Burdick Dep. at 120.) Nor could Lawrence Gutstein, who met with Lucente in January 1991, to talk about his retirement decisions, recall telling Lucente that his retention of the severance payment was subject to future noncompetition. (Gutstein Dep. at 101-03.) In fact, both Burdick and Gutstein testified that the only person who was authorized to set the terms of the severance payment was John Akers. (Burdick Dep. at 8, 120; Gutstein Dep. at 146.) And Akers testified that he did not tell

117 F.Supp.2d 336
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Page 14

Lucente that IBM's severance payment was subject to any noncompetition restrictions. (Akers Dep. at 122.) Akers further testified that he did not tell Burdick that the payment was subject to any kind of noncompetition restrictions:

> Q. ... You didn't tell Lucente that should he in the future engage in competitive employment, that that $675,000 might be sought back from IBM, did you?
> A. I did not.
> Q. You didn't express that to him as being a condition of the payment of the $675,000 did you?
> A. I did not.
> Q. And you didn't instruct anybody else at IBM to tell him that a condition of the $675,000 payment was that he refrain from any future competitive employment?
> A. Not that I recall.

(Akers Dep. at 123). This testimony is completely consistent with Akers' testimony that IBM would make sure that Lucente's leaving IBM and joining Northern Telecom would be viewed as noncompetitive. It is also consistent with the plain language of the letter. Only IBM's position in its papers before this Court--that the Burdick letter expressly conditions the severance payment on continuing noncompetition--is inconsistent with both the testimony of its former CEO and the text of the letter.

Finally, even if the noncompetition language in the February 21, 1991 letter were drafted so as to apply conditions on the payment of severance, such conditions would, as a matter of law, be unenforceable. The noncompetition paragraph in the letter is unreasonable on its face for the same reasons the noncompete clauses in Lucente's long-term compensation plans are unreasonable. The language here goes even further than that--it attempts to create an absolute and total restraint on competition. The period "following your retirement" is not limited in scope or duration, as required under New York law. Further, as discussed above, IBM's attempt to recover the severance payment years after Lucente left IBM belies IBM's *352 interest in protecting itself from any potential unfair or illegal conduct on Lucente's part. He was already constrained by separate agreement concerning trade secrets. And by the time he joined Digital, he apparently had no information that would warrant the protection of a noncompete (or at least IBM has not identified any such information).

Plaintiff's motion for summary judgment on the counterclaim is granted, and the counterclaim is dismissed. [FN7]

> FN7. Having dismissed the counterclaim on the merits of the agreement, I need not address IBM's motion to exclude Plaintiff's statute of limitations, laches and waiver defenses.

IV
DAMAGES

Plaintiff asks that the Court order specific performance under the compensation agreements. He argues that the best way to compensate him for the loss he suffered as a result of IBM's breach is to restore the restricted stock (adjusted for stock splits and dividends) and stock options (with exercise dates adjusted accordingly) that he possessed at the time of forfeiture. In the alternative, Plaintiff requests that the Court award money damages in an amount equal to the maximum potential gains he would have realized from sales of the stock and options between the date of their cancellation and today. IBM opposes specific performance, and instead argues that money damages are the only remedy available to Plaintiff. IBM suggests that the proper measure of damages is the market value of the options and restricted shares on the date of their forfeiture. In the alternative, IBM moves in limine to exclude Plaintiff's damages expert and the report on which he based his estimate of damages.

A. *Specific Performance*

[18][19][20][21] Specific performance is a species of equitable relief. *See* Restatement (Second) of Contracts § 359 (1981). "Before specific performance may be ordered, remedies at law first should be determined to be incomplete and inadequate to accomplish substantial justice." *Leasco Corp. v. Taussig,* 473 F.2d 777, 786 (2d Cir.1972) (citing *Erie R. Co. v. City of Buffalo,* 180 N.Y. 192, 73 N.E. 26 (1904); Williston on Contracts § 1418 (3d ed.1968)). That a remedy at law may exist, however, does not in itself preclude equitable relief. *Id.* If a court finds that substantial justice cannot be achieved through the award of money damages, specific performance may be awarded. *Id.* (citing *Dailey v. City of New York,* 170 App.Div. 267, 274, 156 N.Y.S. 124 (1st Dept.1915)). In considering whether to award specific performance, a court should consider all the circumstances of the case. *Id.* at 785.

117 F.Supp.2d 336
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Page 15

[22] It would not "do equity" to order specific performance of the options with reformed exercise periods, since the relevant periods have long since expired and circumstances today are much more favorable to Plaintiff that they were six or five years ago. Any award of shares of stock today would likewise prove inequitable. Because substantial justice can best be achieved through the award of money damages, I deny Plaintiff's request for specific performance.

B. *Money Damages*

(1) *General Principles*

Plaintiff argues that, if the Court deems money damages adequate, the amount of damages should be determined by a jury. The parties do not dispute the number of shares or options to which Lucente would have been entitled but for the cancellation. However, the parties have radically different ideas about what economic methodology should be employed to measure the value of Plaintiff's injury.

[23] "Although calculation of the amount of damages is a factual determination, *the formula used in making that calculation* is a question of law." *353 *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir.1998) (citing *United States ex rel. N. Maltese and Sons, Inc. v. Juno Constr. Corp.*, 759 F.2d 253, 255 (2d Cir.1985)) (emphasis added). *See also Dana v. Fiedler*, 12 N.Y. 40, 50 (1854); *McAfee v. Dix*, 101 A.D. 69, 75-77, 91 N.Y.S. 464 (1905). The method by which the value of the shares and options should be measured is an issue that must be resolved by the Court.

[24] The general purpose of damages awards is to place the injured party in the position in which she would have been had the contract not been breached. *See Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir.1995); *Brushton-Moira Cent. School Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261, 669 N.Y.S.2d 520, 522, 692 N.E.2d 551 (1998) ("[d]amages are intended to return the parties to the point at which the breach arose.") "It is a fundamental proposition of contract law, including that of New York, that the loss caused by a breach is determined at the time of breach." *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 825 (2d Cir.1990). "The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach." *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225, 232, 269 N.E.2d 21 (1971). *See also Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 626 F.Supp. 1229, 1236 n. 23 (S.D.N.Y.1986) ("Contract damages are measured at the time of breach.")

The parties do not dispute that the date of breach was April 15, 1993, the date IBM cancelled Lucente's restricted stock and stock options, and that damages should be calculated in accordance with Plaintiff's loss on that date. (Complaint ¶ 34). Further, Plaintiff and Defendant agree that Plaintiff's "loss" was the denial of the opportunity to realize future gains (or losses) on the stocks and options. But they differ sharply on how that lost economic opportunity should be measured.

(2) *Plaintiff's Proposed Measure of Damages*

*Restricted Stock:* Restricted stock is stock that IBM awards certain employees and holds in escrow for a period of time, after which it is released to the employee without restrictions. (1989 Plan ¶ 8; 1982 Plan ¶ 7; Escrow and Deposit Agreements). Lucente was granted 12,283 shares of IBM restricted stock. Under the terms of the original agreement, this restricted stock was to be released on the later of January 3, 2000 or the first day of Lucente's retirement from IBM. Since he left the company in 1991, he was entitled to receive the stock free of restriction on January 3, 2000, absent any modification of the original stock terms. Plaintiff calculates damages for forfeiture of the restricted stock as the highest value the stock reached between January 3, 2000, and April 6, 2000, the date Plaintiff filed its motion for summary judgment. (Vaught Report (Bursor Decl.Exh. 52) at 1.) He places this value at $6,129,217, for 49,132 shares (adjusted for splits and dividends).

*Options:* IBM also issues "call" options to employees participating in the incentive award plans. A "call" option is the right to purchase, during a specified period of time, a specified number of shares of IBM capital stock at a fixed price, which is not less than--and frequently significantly higher than--the average of the high and low price of IBM capital stock on the date of grant. [FN8] (1989 Plan ¶ 7(a) (Bursor Decl.Ex. 1)). Prior to the cancellation of his incentive awards, Lucente held 126,739 *354 unexercised IBM stock options. (Letter from W. Burdick to Lucente, Mar. 1, 1991 (Bursor Decl.Ex. 4).) These options had exercise--or "strike"--prices ranging from $96.69 to $159.50, and were subject to expire on a series of dates, ranging from May 23,

117 F.Supp.2d 336  
17 IER Cases 525, 25 Employee Benefits Cas. 2769  
(Cite as: 117 F.Supp.2d 336)

Page 16

1993 to January 28, 2001. (*Id.*) On April 15, 1993, all of these options were "under water;" that is, their strike prices exceeded the market price for IBM shares on that date. Plaintiff seeks damages on the assumption that the benefit of the bargain entitles him the amount he would have made by exercising the options at the exact moment after April 15, 1993 and prior to the expiration date of each options agreement when IBM stock reached its highest value. (*See* Vaught Report, Feb. 22, 2000 at 2; Joint Pretrial Order, Pl. Contentions ¶ 20.) [FN9] Applying this assumption to all the options awards, Plaintiff estimates his total damages as $31,950,218. (Pls.Exh. 11 (Vaught Report at Exh. 2).)

> FN8. In order to exercise a "call" option, the owner of the option tenders the strike price, and receives the shares of stock in return. Thus, when the market price exceeds the strike price, the value of the option will be at least equal to the difference between the strike price and the market price. *See* Gordon Gemmill, Options Pricing 3 (McGraw Hill 1993). A call can be explained through the following example: If the market price of a stock is $10 and the strike price is $8, the holder of the option could elect to exercise the option, tender the $8 in exchange for a share of the stock, and sell the share of stock on the open market for $10. The certain profit in this situation would be $2--the $10 received from the open market sale of the stock less the $8 paid to exercise the option. If the market price is less that the strike price, exercising the call option would result in a loss. However, because the holder of a call option has the right to exercise the option, but is not obligated to do so, the holder will simply elect not to exercise the option whenever the market price is less than the strike price. Thus, the value of the option can never be less than zero.
> *Regier v. Rhone-Poulenc Rorer, Inc.*, Civ. A. No. 9304821, 1995 WL 395948 (E.D.Pa. June 30, 1995). IBM issued options to Lucente with strike prices above the market value of IBM shares on the date of grant.

> FN9. As one example, Lucente was awarded a stock option grant on January 30, 1990 with an expiration date of January 30, 2000. (All of his options grants had ten-year

expiration dates.) (Bursor Decl. Exh. 16.) The exercise or strike price for this option was $96.69 per share. The price of IBM stock remained below the strike price for this option until April 1995. Thereafter, however, the price of IBM stock continued to rise until it significantly exceeded the strike price for that particular option. (IBM Weekly Unadjusted an Adjusted Prices, 4/15/93 to 3/31/00 (Bursor Decl.Exhs. 64-65)). Lucente's damages calculation assumes that, absent IBM's cancellation of the option grants, he would have waited to exercise those options for more than four years after they first became profitable. (Vaught Report (Bursor Decl.Ex. 52.)). On July 13, 1999, IBM stock reached its highest price during the period from April 15, 1993 until January 30, 2000 (the expiration date). According to Lucente's calculations, this particular option should thus be valued at $12,189,290-- the profit he would have made if he had held the option and exercised at the exact moment (July 13, 1999) that IBM shares traded at their highest price.

(3) *Defendant's Proposed Measure of Damages*

*General Objection:* IBM protests that Plaintiff's proposal rewards Lucente with a windfall that benefits from hindsight and does not represent the actual loss sustained or gain prevented as a result of the cancellation. Insofar as the restricted stock is concerned, IBM contends that Plaintiff's calculation is based on a false premise--that the restricted stock would not have been released out of escrow until January 3, 2000. Due to a change in IBM's policies in 1993, if Lucente's stock had not been cancelled in 1993, he would have received the shares out of escrow in November 1993. IBM contends, in any event, that the proper measure of damages is the value of the Lucente's restricted stock holdings on April 15, 1993, discounted 18.7% for lack of marketability (because Lucente was restricted from trading them), which totals $488,719. (Bursor Decl.Exh. 54 (James Report at 10).)

*Options:* IBM urges that the Court adopt one of two widely accepted and widely used finance models for valuing stock options: (1) the Black-Scholes pricing model or (2) the Binomial Pricing model. [FN10] Both these models compute the value of an option based on six inputs: (1) the *355 stock price of the underlying stock at the date of the valuation of the

117 F.Supp.2d 336                                                                                          Page 17
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

options; (2) the exercise price; (3) the time of expiration (4) the annual risk-free rate; (5) the annualized volatility of the underlying stock; and (6) the annual dividend yield of the underlying stock. What both these models have in common is that the value of a stock option--even one that is "under water"--is always positive until the date the option expires. This is true because, no matter how far "under water" the option is, in a open market, a price can be placed on the chance that the shares will rise above the strike price at some point prior to the expiration date. Applying the models to Lucente's option awards on April 15, 1993 yields only marginally different awards: (1) under a Black-Scholes valuation, $320,693; or (2) under the binomial pricing model, $329,953.

> FN10. See F. Black and M. Scholes, "The Pricing of Options and Corporate Liabilities," 81 *Jour. of Pol. Econ.* 637-659 (1972). See also J.C. Cox, S.A. Ross, and M. Rubinstein, "Option Pricing: A Simplified Approach," 7 *Jour. of Fin. Econ.* 229-263 (1979).

(4) *New York Law on the Proper Measure of Damages*

In traditional breach of contract cases, New York courts have rejected adopting the kind of hindsight-based measure of damages Plaintiff proposes. This seems fair. To award damages by valuing the assets at the time of trial constitutes "a two-edged sword ... courts would have to diminish damage awards where the value of the item decreased or where losses were encountered subsequent to the breach as well as enhance them where conditions improve." *Sharma v. Skaarup Ship Management, Corp.*, 916 F.2d 820, 826 (2d Cir.1990). The Second Circuit noted in *Sharma:*

> "New York courts have expressly refused to adopt this 'wait and see' theory of damages. They have explicitly rejected the use of subsequent changes in value or profits where they would increase an award ... and where they would decrease the award."

*Id.* at 826 (citations omitted).

New York courts have applied this rule to breach of contract for real estate, see *Webster v. Di Trapano,* 114 A.D.2d 698, 699, 494 N.Y.S.2d 550, 551 (App.Div.3d Dep't 1985) (contract price of real estate $63,500, value at time of breach $57,500, sold eleven months later for $55,000, damage award should have been $6,000), to fluctuations in currency exchange rates subsequent to breach, see *Parker v. Hoppe,* 257 N.Y. 333, 178 N.E. 550 (1931), and to damages arising from breach of an agreement to purchase securities, see *Aroneck v. Atkin,* 90 A.D.2d 966, 967, 456 N.Y.S.2d 558, 559 (4th Dep't 1982).

*Aroneck* is instructive: the defendants had agreed to purchase certain shares in a corporation from plaintiffs. The trial court found defendants liable for breaching the contract and computed the sellers' damages for the buyers' breach of the contract to purchase by determining the difference between the agreed price of the shares and the fair market value of such shares at the time of breach. The appellate division affirmed the trial court's calculation of damages, specifically holding that the trial court "correctly rejected the valuation theories advanced by [the buyers'] experts to the effect that the value should be based on actual economic conditions and performance of the [business in year's subsequent to the breach] rather than on what knowledgeable investors anticipated the future conditions and performance would be at the time of breach." 90 A.D.2d at 967, 456 N.Y.S.2d 558 (citing 13 N.Y.Jur., Damages, § 43, p. 479.) See also *Simon v. Electrospace,* 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971) (holding that where payment of a finder's fee was to be made in the form of shares of the merging corporation, damages were determined by the value of the shares at the time of breach); *Van Gemert v. Boeing,* 553 F.2d 812 (2d Cir.1977).

While attempting to preserve the rule that damages are measured at breach, New York courts have recognized that valuing the assets on the date of breach--the timing of which can be controlled by the person repudiating the agreement--does not always lead to an equitable result or *356 give plaintiff's the benefit of their bargains. Courts have sought out an intermediate ground in cases where the defendant's breach or tortious conduct deprived plaintiff of the opportunity to sell securities at an optimal price. In *Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136 (2d Cir.1983), an investor brought a complaint before the CFTC after a commodities broker liquidated his futures contracts without his authorization. The CFTC denied the petitioner his request for damages in the amount of profit he would have made on the contracts on the ground that his "failure to attempt to mitigate his damages by reentering the market, or to prove that it was financially or otherwise unreasonable for him to do so, precluded recovery for potential lost profits." *Id.* at 138. The Schultz Court remanded the case to the

117 F.Supp.2d 336
17 IER Cases 525, 25 Employee Benefits Cas. 2769
(Cite as: 117 F.Supp.2d 336)

Page 18

CFTC for determination of damages, holding that "it is necessary when assessing damages in this kind of case to include profits possibly lost as a result of the wrongful conduct." *Schultz* at 140.

In so holding, the Second Circuit relied on *Galigher v. Jones*, 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658, (1889), in which the Supreme Court held:

> the measure of damages in stock transactions of this kind is *the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter*, to be allowed to the party injured to place himself in the position he would have been in had not his rights been violated.
> *Id.* at 200, 9 S.Ct. 335. (emphasis added).

This departure from the general rule was based on the Galigher Court's conclusion that where the conversion involves marketable securities, *the actual loss to the injured party is the loss associated with being forced to sell at an unfavorable time and being denied the opportunity to sell at a favorable time. Id.* (emphasis added).

The Galigher Court did not define a "reasonable time": "What constitutes a reasonable period between the act complained of and the time when reentry into the market would be both warranted and possible will vary from case to case, but the injured party is not actually required to reenter the market in order to determine when he might have done so." *Schultz* at 140. The Court did not require *actual* reentry into the market to measure the damages, because to require an injured party to reenter a volatile or disfavorable market (and risk further losses) would frustrate the purpose of a rule that seeks to make the injured party whole. *Id.*

The Second Circuit in *Schultz* thus carved the rule:

> [T]he measure for damages for wrongful conversion of stock is either (1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired, whichever of (1) or (2) is higher. *See In re Salmon Weed & Co.*, at 342.
> *Id.* at 141.

Other courts "have essentially followed Galigher's reasoning in measuring damages where stock or 'properties of like character' were converted, not delivered according to contractual or other legal obligation, or otherwise improperly manipulated." *Id.* [FN11] It would thus appear appropriate *357 to apply the *Schultz* methodology to a breach of contract case, such as the case at bar, where the defendant's breach deprives plaintiff of control over when to optimize his profits.

FN11. *See, e.g., Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061, 1067-68 (5th Cir.1979) (due to investor's desire not to reenter the market after his contracts were liquidated, damages were assessed as the difference between value at time of liquidation and value at time he decided to stay out of market); *Mitchell v. Gulf Sulphur Co.*, 446 F.2d 90, 104-106 (10th Cir.) (where investors sold stock in reliance on misleading press release, measure of damages is highest price of stock during a reasonable period (between 9 and 17 days) after investors learned of wrong and should have reinvested had they desired to do to), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); *Nephi Processing Plant, Inc. v. Talbott*, 247 F.2d 771, 774 (10th Cir.1957) (turkeys sold at wrong time in breach of instructions to sell at a later date); *In re Schuyler, Chadwick & Burnham*, 63 F.2d 241, 242 (2d Cir.1933) (wrongful hypothecation of stock); *Rivinus v. Langford*, 75 F. 959, 961 (2d Cir.1896) (conversion of a judgment whose value fluctuated according to a debtor's changing financial status); *In re Swift*, 114 F. 947, 949 (D.Mass.1902) (broker's breach of contract to deliver stocks on demand).

[25] IBM argues that, upon learning of IBM's cancellation of his stockoptions and restricted stock, Lucente could have avoided most of the loss (i.e. the gains, viewed in hindsight, on the shares and options) he now seeks by buying equivalent securities in April 1993. (*See* James Report (Bursor Decl.Exh. 54) at 12, James Report (Bursor Decl.Exh. 31) at 134-138, 235.) *See also Simon*, 28 N.Y.2d at 146, 320 N.Y.S.2d at 233, 269 N.E.2d 21 ("If plaintiff were anxious to own the shares rather than obtain their value, he was free to purchase them in the market.") But measuring damages as the higher of the value at breach or the value at some "reasonable" intermediate date following notice of breach, implicitly takes into account Plaintiff's duty to mitigate, [FN12] without requiring that the plaintiff take on additional financial risk in the hopes of avoiding some loss. In addition, here, unlike in *Schultz*, Lucente did not contract to

117 F.Supp.2d 336  
17 IER Cases 525, 25 Employee Benefits Cas. 2769  
(Cite as: 117 F.Supp.2d 336)

Page 19

purchase securities from Defendant. Rather, he was awarded the securities in consideration for his years of service to the company and with the expectation that he would remain loyal to the company (a company that eventually fired him). And while it is true that the securities underlying these grants--IBM common stock--were available on the open market, Lucente was not engaged in the business of investment speculation when he signed the options grants and the restricted stock agreement. Indeed, as an IBM insider, he could not trade. It would be manifestly unjust to require one who has not speculated in the market to then go out and risk large sums of his own money on the grounds that he had a duty to mitigate.

> FN12. The general rule of law in a breach of contract case is that the plaintiff should not be compensated for any loss that he or she could have avoided upon learning that defendant had breached. See *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir.1985) ("New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages."); 2 E. Allan Farnsworth, *Farnsworth on Contracts*, § 12.12, at 226 (2d ed.1998).

IBM cites a number of cases for the proposition that, even where the underlying asset is a stock option award, courts have measured plaintiffs' damages in reference to their value at the time of breach. However, the facts of all the cases by IBM are clearly distinguishable from those here. In all those cases, the date of the breach was the date on which the plaintiff attempted to exercise options that were already "in the money," only to be notified that defendant would not honor the options awards. For example, in *Ertugrul v. Octel Communications Corp.*, No. C-95-20639, 1996 WL 207773, *1 (N.D.Cal. Apr. 19, 1996), plaintiff attempted to exercise his stock options three years after his termination from defendant, at which time defendant blocked him from exercising the options based on a dispute over the date the options were to vest. The date of breach was determined to be the date of plaintiff's attempt to exercise the options, since but for defendants's breach he would have gotten the difference between the strike price and the market price on that day--a day on which the options were, of course, "in the money." The court simply measured the damages as the difference between the exercise price and the value of the underlying shares on the date of breach. *Id.* at *5.

Likewise, in *Hermanowski v. Acton Corp.*, 729 F.2d 921 (2d. Cir.1984) (per curiam), the court simply set the damages as the date of breach the date *358 on which plaintiff attempted to exercise 5,000 shares of his stock option award at a time when the underlying shares were trading at a value almost ten time the exercise price. It ordered damages to be measured as the difference between the exercise price and the value of shares on the date of breach. [FN13]

> FN13. See also *Scully v. Wats*, Civ. A. 97-4051, 1999 WL 391495 (June 8, 1999 E.D.Pa.) (damages measured at time plaintiff attempted to exercise options but was repudiated by defendant); *Colorado Management Corp. v. American Founders Life Ins. Co.*, 148 Colo. 519, 367 P.2d 335, 337 (1961) (in action for refusal to deliver shares per stock option agreement on a date when the share price exceeded the exercise price, affirming trial court holding that measure of damages was market price at time of refusal to deliver); *Finnell v. Bromberg*, 79 Nev. 211, 381 P.2d 221, 227 (1963) (in action for breach of stock option agreement, damages measured on date optionee attempted to exercise his "in the money" options but was repudiated by grantor).

Of course, not one of the cases cited by either party--nor any that the Court unearthed on its own--involved the facts here: The breach of a contract to award stocks that were not yet released from escrow and/or of options that were "under water." It is this unique fact pattern that complicates the selection of a damages methodology here.

C. *Award of Damages*

(1) *Restricted Stock*

[26] Applying the case law to these facts, I conclude that it would be manifestly unreasonable to set as the valuation of Lucente's restricted stock the value of the stock on April 15, 1993. The shares were not out of escrow at that time, and, even absent IBM's breach, Lucente could not have sold them then. Under the terms of his original restricted stock agreement, Lucente would not have been entitled to take possession of the restricted shares until January 3, 2000. However, in September 1993, the IBM Board approved an acceleration of release from

117 F.Supp.2d 336  
17 IER Cases 525, 25 Employee Benefits Cas. 2769  
(Cite as: 117 F.Supp.2d 336)

Page 20

escrow all restricted stock awards made to IBM executives pursuant to the 1989 Long-Term Variable Plan and the Variable Compensation Plan. Under the terms of the acceleration, all restricted stock issued prior to 1993 become payable to the plan participant on the earlier of the date set forth in the applicable agreement or the date one year from the date of retirement. (*See* Approval of Modification of Restrictions on Restricted Stock Awards, dated Sept. 28, 1993 (Bursor Decl. at Exh. 44).) For employees who had retired more than one year previously, the stock was released from escrow effective sometime after November 5, 1993, the date on which Lou Gerstner sent letters to all retired IBM executives who would be affected by the Board's approval of the acceleration plan. (Letter from L.V. Gerstner to E.F. Rogers dated Nov. 5, 1993 (Bursor Decl. at Exh. 45).)

Plaintiff disputes IBM's characterization of the acceleration, claiming that IBM has produced no evidence that this modification applied to former IBM executives who had been retired for more than two years at the time the modification was adopted. However, no such extrinsic evidence is required. It is clear on the face of the modification that the terms apply to "all awards of restricted stock made prior to 1993." (*Id.*) There is nothing limiting its application to any one type of employee or retiree. I therefore conclude that Lucente would have been entitled to the accelerated release date, which in his case would have been upon notification of the modification in or around November 1993.

[27] It follows from both the conversion and breach of contract cases that, where the asset being contracted for is stock, the plaintiff's loss arises from the failure to deliver the shares, and thus from the gains he would made or loss he would have prevented by controlling the time to sell. *See* discussion at Sec. V.B.4, *infra*. Here, Lucente's right to trade the shares did not accrue until such time as IBM released the shares from escrow. *359 IBM's proposed measure of damages values Lucente's shares at a time when his benefit of the bargain had not yet accrued. On top of that, IBM seeks to further penalize Lucente for the fact that it had not accrued by discounting for lack of marketability. This does not give Lucente anything like the benefit of the bargain. Applying the *Galigher-Schultz* methodology, it is my conclusion that damages should be measured only after the date on which Lucente's shares were freely tradeable.

[28] Another way to view the restricted stock agreement is to consider the accrued value of the shares during the escrow period as foreseeable consequential damages, under the venerable principles of *Hadley v. Baxendale,* 156 Eng.Rep. 145 (1845). IBM breached the agreement to award the shares and deliver them at the end of the escrow period. IBM also controlled the condition under which the shares had been awarded, i.e., the escrow arrangement. It was therefore reasonably foreseeable *to IBM* that the accrued value of the shares at the end of the escrow period was a natural consequence of its breach. And, where the loss is foreseeable by the party in breach, consequential damages may be awarded. *See* III Farnsworth on Contracts § 12.14 at 245. See also, *Charles E.S. McLeod, Inc. v. R.B. Hamilton Moving and Storage,* 89 A.D.2d 863, 864, 453 N.Y.S.2d 251, 253 (2d Dept.1982) (damages recoverable are those "which at the time of the making of the contract the defendant had reason to foresee would be a natural and probable consequence of the breach.")

Under the *Galigher-Schultz* principles, or the law of consequential damages, I therefore hold that the measure of damages for breach of the restricted stock agreement must take into account the fact that, absent IBM's breach, he could not have sold the shares until early November 1993--the time at which Gerstner informed retired IBM executives of the acceleration of the pay-out dates on the stock awards. Lucente is entitled to the higher of: (1) the value of the stock on the date his shares would have been released from escrow (measured as the date he would have received notice of their release from escrow); or (2) the highest intermediate value between the date of the release from escrow and the end of reasonable period thereafter.

Because the parties have not addressed this alternative measure of damages in their papers, the parties have thirty days from the date of this notice to provide the Court with proposed evidence of: (1) the actual date of notice of the accelerated release from escrow; and (2) objective measures (dates and time market was open, time required to execute an order, etc.) as to what would constitute a "reasonable period" within which Plaintiff could have sold his shares. To the degree that parties dispute any facts (not hypotheses or speculation as to what Plaintiff's actual trading history might have been), a jury will determine the proper award of damages under this measure.

(2) *Damages for the Stock Options*

117 F.Supp.2d 336  
17 IER Cases 525, 25 Employee Benefits Cas. 2769  
(Cite as: 117 F.Supp.2d 336)

Page 21

[29] Valuing the breach of the options requires a different approach. Lucente could have exercised options at any time after they were awarded and before they expired. Thus, there was no date on which it was reasonably foreseeable that Lucente would have exercised the options.

The options-valuing models proposed by Defendant are forward-looking. That is, they attempt to place a value on a current asset (the option) taking into account the risk involved in future price fluctuations. Hindsight, of course, is 20/20 and the market value of IBM shares in the period following IBM's cancellation of the options in this case is a matter of record. It is for this reason that Plaintiff argues that the forward-looking pricing models fail to compensate him for the "benefit of his bargain." However, Plaintiff's proposed measure of damages requires the Court to accept as a factual assumption that Plaintiff would have exercised each and every *360 one of his options at the exact moment prior to the expiration dates when IBM stock traded at its highest value. [FN14] The statistical probability of this ever having happened, I would imagine, approaches zero. Only with the benefits of 20/20 hindsight could Plaintiff have hoped to fare so well. And the law does not entitle him to the benefit of hindsight.

> FN14. IBM seems to make something of the fact that Lucente divested himself of all his other IBM shares in 1995. (Bursor Decl.Exh. 62 (Lucente 1996 tax return)). This fact, of course, is irrelevant to any determination of the measure of damages, which here is a pure question of law. It nonetheless underscores this Court's conclusion that the economic assumptions underlying Plaintiff's damages estimate is based on behavior that is unachievable in the real world, as belied by Plaintiff's own investing behavior.

Defendant's proposed measure of damages is also flawed. Defendant's valuation requires another unlikely assumption: that Plaintiff would have (or even could have) converted his interest in his options to a saleable commodity at a time when the options were still "under water." Of course, by their very nature, employee stock option awards are not saleable on the open market. Even if they were saleable, the likelihood that an employee--who has already agreed to accept compensation in the form of these incentive awards--would sell the option rights when the options were under water, rather than waiting and hoping that the options would go "in the money," is remote.

However, adoption of one of the net present value measures of the options appears to be the only sensible legal rule that ensures justice in all similar cases. It is manifest that Plaintiff would not have exercised the stock options while they were under water. But because that is true, it is also manifest that, had the value of the IBM shares continued to fall throughout the exercise periods for each of his options awards, Plaintiff would have realized no profit at all from them. Yet this Court would not find it appropriate to order him only nominal damages. Whether the stock rose dramatically in the years prior to the date Plaintiff brought suit or languished well below his exercise prices should have no effect on this Court measure of the damages.

I therefore decline Plaintiff's suggestion that damages be calculated under his theory. I will not, on this record, rule on Defendant's motion to exclude Plaintiff's expert Vaught, because Plaintiff may wish to call Mr. Vaught as an expert to offer his opinion on an appropriate net present value calculation of the options damages. I underscore, however, that Vaught's current report, premised as it is on a "hindsight"-based valuation, will not be admissible. Modern finance theory accepts several models for determining the net present value of an option grant, Black-Scholes and the binomial model are just two of them. While the differences in total valuation may, on these facts, result in only small differences of value, Plaintiff is entitled to present those differences as a question of fact to a jury. The parties are ordered to submit proposed expert testimony on this question to the Court within thirty days of this order.

This constitutes the decision and order of this Court.

END OF DOCUMENT